IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

JASON KESSLER

and

DAVID MATTHEW PARROTT,

       *Plaintiff,*

v.                                                                                  Civil Action No. **3:19-CV-00044**

CITY OF CHARLOTTESVILLE,
TARRON J. RICHARDSON, in his
official capacity, AL S. THOMAS in his
individual capacity, BECKY CRANNIS-CURL
in her individual capacity, MAURICE JONES
in his individual capacity,

       *Defendants*.

## CITY OF CHARLOTTESVILLE'S
## BRIEF IN SUPPORT OF MOTION TO DISMISS

Comes now the City of Charlottesville and submits the following brief in support of its Rule 12(b)(6) F.R.C.P. Motion to Dismiss Jason Kessler ("Kessler"), and David Matthew Parrott's ("Parrott") Complaint.

## INTRODUCTION

In 1982, the United States Supreme Court reaffirmed in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) that "the First Amendment does not protect violence" citing Justice Douglas' concurring opinion in *Samuels v. Mackell*, 401 U.S. 66, 75 (1971). As apt to the August 12, 2017 rally, the Court in *Samuels* stated that, "Certainly violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of advocacy," *Samuels* at 75.

The Complaint against the City of Charlottesville should be dismissed for several reasons. There was no violation of Plaintiffs' First Amendment rights to freedom of speech, as they were not entitled unilaterally to a municipal or state security detail to ward off counterprotesters, an unlawful assembly was declared, and the entire crowd – protesters and counter-protesters – dispersed. The dispersal order in the face of violence was a content- and viewpoint-neutral restriction on speech. "The First Amendment does not protect violence." *Claiborne Hardware* at 916. The Complaint now names as a co-defendant the former City Manager of the City of Charlottesville, Maurice Jones in his individual capacity and asserts that he individually engaged in misconduct. While the City denies that allegation, it is axiomatic under *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-691 (1978) that the City as a municipality cannot be held liable under § 1983 on a *respondeat superior* theory for claimed misconduct by its former City Manager in his individual capacity, nor for that matter for the alleged misconduct of its former Chief of Police Co-Defendant Thomas.

Finally, simply stated, the Complaint fails to state a plausible *Monell* claim against the City of Charlottesville because it fails to state a plausible claim of an undergirding constitutional violation against its final policy maker. Consequently, the Complaint fails to state a plausible claim of any First Amendment deprivation properly attributable to the City of Charlottesville as a result of a policy/order.

## FACTS ALLEGED

Kessler and Parrott allege that after a July 8, 2017 Ku Klux Klan (KKK) rally, at which the Charlottesville Police Department (hereinafter "CPD") separated the "political speakers" (KKK) and Antifa and were assaulted and spit on by alleged Antifa (¶ 45), Chief Thomas told his subordinates, "I'm not going to get [Alt-Right] in and out" (¶ 47) during the 8/12/17 rally. Plaintiffs claim that prior to the August 12, 2017 Unite the Right (hereinafter "UTR") rally that Defendants had intelligence

that violent counter-protesters would attend the rally and planned violence in an attempt to impose what they argue is a "heckler's veto" (¶¶ 42 and 44). In preparation for the rally, the Kessler Plaintiffs claim that the Charlottesville Police were simply ordered not to actively engage in "every little thing" (¶ 50); not to go in and "break up fights" (¶ 50); and not to interrupt "**mutual combat**" (¶ 50) and were warned not to go among the crowd where they might get hurt (¶ 50). Kessler and Parrott allege in the Complaint that during the August 12, 2017 "event," Chief Thomas, upon being advised that **violence** between the two groups, was occurring apparently between Kessler's "right" rally goers (hereinafter "Alt-Right") and counter-protesters he alleges were "Antifa" (hereinafter "counter-protesters"), that Chief Thomas stuck with his plan and stated "Let them fight, it will make it easier to declare an unlawful assembly" (¶ 51). Plaintiffs admit that mutual combat occurred by alleging that Charlottesville police did indeed "let them fight" (¶ 52). Kessler and Parrott allege that Co-Defendant Maurice Jones, the City Manager of Charlottesville at the relevant time was Charlottesville's final policy maker. Plaintiffs allege that Jones communicated with former Chief of Police Thomas specifically about Antifa prior to August 12, 2017 and that Jones knew of and approved of Thomas' orders (¶ 61). Plaintiffs further allege that Jones was present in the "command center" together with former Chief Thomas on August 12, 2017 and heard Thomas say, "Let them fight; it will make it easier to declare an unlawful assembly." (¶ 62) Kessler and Parrott admit that an unlawful assembly was declared (¶ 76). The unlawful assembly declaration required everyone including the Alt-Right and counter-protesters to disperse.

## RULE 12(b)(6) MOTION TO DISMISS
## STANDARD OF REVIEW

In order to survive a Rule 12(b)(6) motion, the Plaintiffs' Complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face'". *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Complaint's factual allegations must produce an inference of

liability strong enough to push the Plaintiffs' claims "across the line from conceivable to plausible". *Iqbal* at 683. Under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), not only must the Complaint contain facts sufficient to state a claim for relief that is plausible on its face, the Complaint's "factual allegations must be enough to raise a right to relief above the speculative level". *Twombly* at 555. When a complaint pleads facts that are merely "consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief". *Twombly* at 557. In *Iqbal*, the United States Supreme Court stated that two working principles underlie its earlier decision in *Twombly*. While a court reviewing a Rule 12(b)(6) motion must accept as true all of the factual allegations contained in a complaint, **it is not bound to accept legal conclusions, including those couched as factual allegations.** (emphasis supplied) *Iqbal* at 679. Only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal* at 679; *Twombly* at 556. In determining whether a complaint states a plausible claim for relief, the court engages in a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense". *Iqbal* at 679. Finally, where actual "well pleaded facts" do not permit the Court to infer more than the mere "possibility of misconduct", the pleader is not entitled to relief. *Iqbal* at 679. Mere formulaic recitals of the elements of a cause of action supported by mere conclusory statements do not suffice to state a plausible claim for relief. *Iqbal* at 678.

## ARGUMENT

## RULE 12(b)(6) F.R.C.P. MOTION TO DISMISS

1. **COUNT IV OF THE COMPLAINT FAILS TO STATE A CLAIM ACTIONABLE AGAINST THE CITY UNDER *MONELL* OF A FIRST AMENDMENT VIOLATION. IT IS AXIOMATIC THAT THE FIRST AMENDMENT DOES NOT PROTECT VIOLENCE. THE ALLEGED NON-INTERVENTION/MONITORING ORDER AND DECLARATION OF UNLAWFUL ASSEMBLY, APPLIED EQUALLY TO BOTH THE "RIGHT" PLAINTIFFS AND ALLEGED "ANTIFA" PROTESTERS AND WAS NOT A HECKLER'S VETO.**

In *Sines v. Kessler*, 324 F.Supp.3d 765 (W.D.Va. 2018) this Court cited the United States Supreme Court's opinion in *Claiborne Hardware Co.* for the proposition that "the First Amendment does not protect violence", *Claiborne* at 916, and on July 9, 2018 denied in large part a Motion to Dismiss by now Plaintiff Jason Kessler and other defendants in that case. This Court rejected Kessler et al's First Amendment "advocacy" argument as a defense in the Motion to Dismiss they raised to claims from individuals injured on August 12, 2017. In doing so, this Court noted, as apt to this case, that, "In 1871, Congress passed a law 'directed at the organized terrorism in the Reconstruction South'". *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600 (1979); *see* 42 U.S.C. §1985. Over 140 years later, on August 11th and 12th, 2017, the Defendants (including the two plaintiffs in this case in this lawsuit) including the Ku Klux Klan, various neo-Nazi organizations, and associated white supremacists, held rallies in Charlottesville, Virginia. **Violence erupted."** (Emphasis supplied.) *Sines at 773*. The violence observed by co-defendants Thomas and Jones that erupted on August 12, 2017 before the unlawful assembly was declared involved the rally attendees, both the Alt- Right groups and counter-protesters. Subsequent to this Court's ruling against defendants in *Sines*, Kessler and Parrott filed their Complaint in this case.

Chief Thomas' non-intervention/monitoring policy/order Plaintiffs allege applied equally according to the Complaint to the Alt-Right Plaintiffs and counter-protesters. The declaration of an Unlawful Assembly pursuant to §§18.2-406 & 407 Va. Code Ann. (1950) necessitated by the escalating violence observed by the City Manager, Chief of Police, CPD and the Virginia State Police (hereinafter "VSP") does not constitute a "heckler's veto" policy. The dispersal order applied equally to the Alt-Right and counter-protesters and required them all to disperse from the scene. before the speaking even began. Section 18.2-406 Va. Code Ann. (1950) provides that:

5

> Whenever **three or more persons** assembled share **the common intent to advance some lawful or unlawful purpose by the commission of an act or acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order, and the assembly actually tends to inspire persons of ordinary courage with well-grounded fear of serious and <u>immediate</u> breaches of public safety, peace or order, then such assembly shall be guilty of a Class 1 misdemeanor.** If any such person carried, at the time of his participation in an unlawful assembly, any firearm or other deadly or dangerous weapon, he shall be guilty of a Class 5 felony. (emphasis supplied)

Following the declaration of an unlawful assembly pursuant to §18.2-407 Va. Code Ann. (1950), Kessler and Parrott as well as the counter-protesters were all required to disperse. The First Amendment right to free speech and association was temporarily restrained– constitutionally for all who were present.

In *United Steelworkers of America AFL-CIO-CLC v. Dalton*, 544 F.Supp. 282 (E.D.Va. 1982) Judge MacKenzie upheld the constitutionality of §18.2-406 and §18.2-407 against a First Amendment facial challenge. In doing so the Court stated that the language of §18.2-406 closely follows the common law definition of unlawful assembly. The Court noted that the definition requires the existence of circumstances evidencing a present threat of violence or breach of public order. He observed that there is no doubt that the states retain the right to maintain public order and noted that "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order appears, the power of the state to prevent or punish is obvious." *Cantwell v. Connecticut*, 310 U.S. 296 (1940). In *Dalton*, the district court found that §18.2-406 does no more than exercise that power and that on its face §18.2-406 does not impermissibly infringe upon First Amendment rights. In *Dalton*, the Court further found that §18.2-407, requires all persons present (including in this case equally Kessler and Parrott Alt-Right and counter-protesters ) to disperse from the scene. The Court found that Virginia Code Section 18.2-407

6

does not violate the First Amendment, concluding that "Thus before §18.2-407 can be invoked, the public peace and order must be in jeopardy. At such a time, it is not unreasonable to authorize the police to clear the streets. This is not a long-term measure. Once order is restored, those engaged in lawful activity may return to the streets, but at the time of a disturbance, or when there is a clear and present danger of immediate disturbance, the Commonwealth requires that the police be able to take quick action. To require individual determinations of who is acting lawfully and who unlawfully would prove unduly burdensome." *Dalton* at 289.

In *Turner v. Al Thomas, Jr.*, 313 F.Supp.3d 704, 717 (W.D.Va. 2018), (involving the same 8/12/17 "rally") this Court earlier found that there is no constitutional duty under the Fourteenth Amendment for the police to affirmatively intervene to protect a citizen such as Kessler and Parrott or as in *Turner*, a counter-protester, from criminal conduct by third parties. In *Turner*, this Court found that framing the incident in terms of a "stand down" order is no more than an "artful recharacterization" of inaction as action-and is something that the Fourth Circuit in *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995) warned was inappropriate. The alleged "stand down" order in *Turner* did not entitle Turner to the "state created danger" exception. In this case, the Plaintiffs attempt to substitute a non-intervention/monitoring order/policy issued by the Chief of Police for a "stand-down order". This substitution is the functional equivalent of the "stand down" order which this Court has already concluded does not violate the Fourteenth Amendment due process clause.

In recently affirming this Court's dismissal of Turner's 14th Amendment due process claim the Fourth Circuit adhered to a narrow reading of the state created danger doctrine exception to the general rule stated by the U.S. Supreme Court in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 196 (1989). The Fourth Circuit held that in general the mere failure to

act does not give rise to liability under the due process clause of the 14th Amendment. *Turner v. Thomas*, 93 F.3d 640, 645 (2019).

In *Turner*, the Fourth Circuit reiterated *DeShaney's* holding and found that the same inaction alleged by Plaintiffs here does not violate the 14th Amendment. In *Turner*, the Fourth Circuit noted that in *DeShaney v. Winnebago County*, 489 U.S. at 196,

> "the Supreme Court stated that because the Fourteenth Amendment was intended to protect "the people from the State, not to ensure that the State protected them from each other…[a]s a general matter…a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 196-97, 109 S.Ct. 998. Given that "the Due Process Clause does not require the State to provide its citizens with particular protective services," wrote the Court, "it follows that the State cannot be held liable for injuries that could have been averted had it chosen to provide them." *Id.* at 196-97."

Turner at 645. The Court in denying the applicability of the state created danger exception to *DeShaney* to the mutual combat at the 8/12/17 "Unite the Right" rally found that the inaction "stand down" policy facts pled by Turner were insufficient noting that "Turner has put forth no facts suggesting that a stand-down order crosses the line from inaction to action when the state conduct in *Pinder* and *Doe* did not. Acting under *Pinder*'s teaching that state actors may not be held liable for "st[anding] by and d[oing] nothing when suspicious circumstances dictated a more active role for them," *Turner* at 646.

Plaintiffs' claim that Jones' and Thomas' inaction and failure to order action--only against counter protesters--effectuated or acquiesced to a heckler's veto and, that thereby, Defendants engaged in a content- and viewpoint-based restriction in violation of the First Amendment. Plaintiffs' conclusory allegation that Defendants engaged in content and viewpoint-based restriction and a "heckler's veto" is a legal conclusion that is not accepted as true for the purposes of ruling on this motion to dismiss. *Twombly*, 550 U.S. at 555. Defendants submit that the First Amendment does not impose an affirmative duty for the police to do something that the Fourteenth Amendment does not.

8

The First Amendment does not proscribe inaction when equally applied to all "rally" attendees any more than does the Fourteenth Amendment.

The alleged planned and effectuated non-intervention/monitoring policy not to get involved and interfere with the rally and not to break up "mutual combat" (¶53) or "break up every fight" (¶53) does not constitute as a matter of law a so-called heckler's veto. Inaction against all groups is not action.

The claimed policy challenged is easily distinguished from the majority of the First Amendment heckler's veto policy cases, which by their nature involved affirmative action by way of arrest or removal of only the unpopular speaker(s) at the expense of the hecklers as opposed to all groups equally. *See e.g., Berger v. Battaglia*, 779 F2d 992 (4th Cir. 1985).

In *Bible Believers v. Wayne Cnty.*, 805 F.3d 228 (6th Cir. 2015), the Sixth Circuit in an *en banc* decision found a violation of the First Amendment through a heckler's veto. In *Bible Believers*, unpopular speakers confronted by a hostile crowd were singled out and silenced by removal and citation as an expedient alternative to containing or ceasing the lawless behavior of individual hecklers alone. Unlike the facts in *Bible Believers* where the speakers alone were the subject of an affirmative act, i.e. removal, in this case Plaintiffs admit that both groups were treated equally under the alleged non-intervention/monitoring limited action policy, and neither group was favored in any way by police or the City Manager, both prior to and after the Unlawful Assembly Declaration. Following the unlawful assembly declaration, Kessler, Parrott, and the other Alt-Right attendees were treated equally with the counter-protesters. Neither group was allowed to speak following the lawful declaration of unlawful assembly due to the mutual combat violence which Plaintiffs allege both the City Manager and Chief of Police observed from the command center.

The facts of the present case stand in contrast to those in *Bible Believers*. In *Bible Believers*, a self-described evangelical group attended the May 2012 Arab International Festival in Dearborn, Michigan to try and convert non-believers and call for sinners to repent. 805 F.3d at 236-37. The group had attended the Festival the year before (2011) where they had been permitted to occupy the "free speech zone" on the first day of the festival. When they returned for a second day in 2011, the free speech zone had been removed, which required the Bible Believers to wander through the festival grounds on the second day of the Festival. The Bible Believers alleged that they were assaulted by hostile crowds on that second day in 2011, and also alleged that Wayne County Sheriff's deputies had ordered them to leave. *Id.* at 236. In anticipation of the 2012 Festival, the Bible Believers sent a letter to the County and Sheriff identifying the problems from 2011 and advising the County that the group would be returning for the 2012 Festival. *Id.* at 236-37. The County responded by disagreeing with both the Bible Believers' version of events and the duties owed the group under the law. *Id.* at 237.

During the 2012 Festival, the group wore t-shirts with their messages, carried signs, and carried a severed pig's head on a spike. *Id.* at 238. The group preached to the Festival attendees, and onlookers began to throw plastic bottles and debris at them. *Id.* at 239. Each time a Sheriff's deputy would approach, the crowd would cease its assault. *Id.* at 239-40. Eventually, the law enforcement officers provided the Bible Believers only two alternatives: be escorted out of the festival grounds or be arrested themselves for disorderly conduct. *Id.* at 240-41. The Chief Deputy informed the Bible Believers leader that, because of the things they were saying, they "were attracting a crowd and…affecting public safety." *Id.* at 240.

The United States District Court for the Eastern District of Michigan entered summary judgment in favor of the defendants, and the Bible Believers appealed to the Sixth Circuit Court of Appeals. *Id.* at 241-42. An en banc review followed, and the Sixth Circuit reversed the District

Court's decision and entered summary judgment in favor of the Bible Believers. *Id*. at 242, 261-62. The Sixth Circuit determined, based on the facts at issue in that case, that the County had violated the Bible Believers' First Amendment rights, violated their free exercise rights, by effectuating a heckler's veto and rights to equal protection, and that the individual sheriff's deputies were not entitled to qualified immunity. *Id*. at 255-60.

In *Bible Believers* the Sixth Circuit limited its holding by noting that the Constitution does not require that the officer "go down with the speaker". *Bible Believers* at 253. Carried to its logical conclusion Plaintiffs "hecklers veto" claim requests that outcome in this case. In stating that when the police seek to enforce law and order they must do so in a way that does not unnecessarily infringe upon the constitutional rights of law-abiding citizens, as options, the Sixth Circuit in *Bible Believers* noted that one of law enforcement's options is to attempt to disperse the entire crowd if that becomes necessary. *Bible Believers* at 253. When Jones and Thomas witnessed (see ¶¶ 62 "Let them fight) mutual combat and fighting between the Alt-Right and counter-protesters on August 12, 2017 each group was treated equally via the Unlawful Assembly Declaration. Unlike the fact pattern in *Bible Believers,* which involved affirmative action of the police to only remove the unpopular speaker in order to restore peace and public order, in this case the Complaint on its face deals with mutual violence by the Alt-Right and the counter-protesters. The mutual combat and violence which resulted in an unlawful assembly declaration equally curtailed all first amendment rights temporarily. In *Turner,* this Court found that Chief Thomas' alleged stand-down policy and action did not state a Fourteenth Amendment due process claim. *Turner* 313 F. Supp. 3d at 717. The City submits that the same inaction, non-intervention, monitoring alleged plan which treated the protesters and counter protesters equally did not violate the First Amendment, and is not, as Plaintiffs in conclusory fashion allege, a "heckler's veto".

Plaintiffs' assertion that the City's reaction to pre-event intelligence and what its former City Manager witnessed on 8/12/17 amounted to content and viewpoint-based restriction of their speech rests upon the conclusory allegation that Defendants effectuated or acquiesced to a heckler's veto (¶¶ 78-79) because the former City Manager failed to act on pre-8/12/17 event intelligence against counter-protesters alone. It is true that, "[l]isteners' reaction to speech is not a content-neutral basis for regulation, or for taking an enforcement action against a peaceful speaker." *Bible Believers v. Wayne County, Mich.,* 805 F.3d 228, 247 (6th Cir. 2015) (citing *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966)). Action alleged to amount to a heckler's veto is, thus, subject to strict scrutiny. *Id.* at 248 (citing *McCullen v. Coakley*, 134 S. Ct. 2518, 2530 (2014)). However, in *Bible Believers* the Sixth Circuit held that;

> The rule to be followed is that **when the police seek to enforce law and order**, they must do so in a way that does not unnecessarily infringe upon the constitutional rights of law-abiding citizens. . . . **The police may** go against the hecklers, cordon off the speakers, or **attempt to disperse the entire crowd if that becomes necessary.** Moreover, they may take any appropriate action to maintain law and order that does not destroy the right to free speech by indefinitely silencing the speaker. (Emphasis supplied.)

*Id.* (citing *Gregory v. City of Chicago*, 394 U.S. 111, 120 (1969)). *Bible Believers* at 253.

In the present case, law enforcement based on the violence and fighting ("mutual combat"), that the Plaintiffs allege was witnessed by its City Manager and Police Chief, declared an unlawful assembly – equally applied to both the Alt-Right and counter-protesters. The actual mutual combat Plaintiffs allege that the Police Chief and City Manager witnessed was a clear and present danger that justified the declaration of unlawful assembly on August 12, 2017, and all parties contributing to that danger were treated equally. Plaintiffs have not challenged the actual validity of this declaration. Without any legal authority or precedent, Plaintiffs baldly claim that the City owed them alone a duty of protection and that the City police had a duty to act to prevent having to declare an unlawful

assembly. Neither the Fourteenth Amendment or the First Amendment impose such a duty on a municipality.

Unlike the situation in *Bible Believers*, where the peaceful protestors were removed from the event because of the violent actions of the listeners, thereby violating the peaceful protestors' First Amendment rights by effectuating a heckler's veto, there was no such violation in the present case. Neither the declaration of unlawful assembly nor the dispersing of both the Alt-Right and the counter-protestors, violated Plaintiffs' First Amendment rights to freedom of speech. By its very nature, the dispersing of both the Alt-Right and counter-protestors was a content- and viewpoint-neutral restriction on speech.

### 2. THE FIRST AMENDMENT DOES NOT REQUIRE POLICE TO PROTECT PLAINTIFF.

The crux of Plaintiffs' First Amendment claim appears to be that law enforcement did not take sufficient action to quell the counter-protestors before or during the 8/12/17 rally, thereby permitting the UTR rally to proceed. Plaintiffs appear to be requesting that this Court require Defendants to impose a "heckler's veto" on counter protesters in order to allow them to speak unimpeded. Plaintiffs allege that law enforcement purposefully did nothing so that they could declare an unlawful assembly and disperse the entire crowd. Plaintiffs allege as a conclusion of law that this is a heckler's veto.

While Plaintiffs do enjoy a First Amendment right to freedom of speech, they do not have a constitutional right to protection. As the Fourth Circuit has held, "[T]here simply is 'no constitutional right to be protected by the state against…criminals or madmen,'" and a state actor's "'failure to do so is not actionable under section 1983.'" *Doe v. Rosa*, 795 F.3d 429, 440 (citing *Fox v. Curtis*, 712 F.2d 84, 88 (4th Cir. 1983); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982)); *see also Turner v. Thomas*, 313 F. Supp. 3d 704 at 717 (W.D. Va. 2018). (finding that *DeShaney, Pinder, Waybright,*

*Doe* and *Stevenson* all lead to the same conclusion that Turner's underlying Fourteenth Amendment claims failed on their merits.)

The irony in this case is that the City and its former City Manager and former Police Chief are being accused of imposing a "heckler's veto" by both the Kessler UTR rally plaintiffs and the counter-protesters. The reality of the "policy" assailed by Plaintiffs is that as a result of the Defendants' alleged "inaction" and monitoring no one was shot despite the presence of openly displayed firearms on both sides. There was mutual violence and fighting between both the Alt-Right and counter-protestors such that law enforcement observed not only imminent but actual "acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order" tending to inspire "serious and immediate breaches of public safety, peace or order." Va. Code § 18.2-406. These circumstances necessitated the dispersal of the entire crowd, not just the Alt-Right or the counter-protesters. This did not violate Plaintiffs' First Amendment rights to freedom of speech. See *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. Stuart 934 F.2d 318 (4th Cir. 1991)*. Count IV of the Complaint fails to state a claim and should be dismissed with prejudice.

### 3. THE AMENDED COMPLAINT FAILS TO STATE A PLAUSIBLE *MONELL* CLAIM AGAINST THE CITY OF CHARLOTTESVILLE SINCE IT FAILS TO STATE A PLAUSIBLE CLAIM OF AN UNDERGIRDING CONSTITUTIONAL VIOLATION BY CHIEF THOMAS OR FORMER CITY MANAGER MAURICE JONES.

For a municipality to be liable under §1983, a plaintiff must demonstrate an underlying constitutional violation. *Waybright v. Frederick Cty. Md.*, 528 F.3d 199, 203 (4th Cir. 2008) "Municipalities cannot be liable under §1983 without some predicate "constitutional injury at the hands of the individual (state officer) at least in suits for damages." (quoting *City of Los Angeles v. Eller*, 475 U.S. 796, 799 (1986); *see also Stevenson, ex rel. Stevenson v. Martin Cty. Bd. of Educ.*, 3 Fed.Appx. 25, 33 (4th Cir. 2001) "An award of damages against a municipality based on the actions

of its officers is not available unless the officers' conduct amounted to a constitutional injury.") In *Los Angeles County California v. Humphries*, 562 U.S. 29 (2010) the United States Supreme Court extended this rule to claims for prospective relief including declaratory or injunctive relief.

Here, as this Court previously concluded in *Turner v. Al Thomas, Jr.,* 313 F.Supp.3d 704 (W.D.Va. 2018), since Co-defendant former Police Chief Al Thomas is again entitled to qualified immunity and former City Manager Maurice Jones, under the same rationale, is entitled to qualified immunity under both prongs of the qualified immunity test (for the reasons asserted by Co-defendants Thomas and Jones in their Motions to Dismiss and supporting briefs filed in this case on the issue of the sufficiency of the Complaint to state a plausible claim of a constitutional deprivation, which are incorporated herein, no constitutional violation is stated in the Complaint against Maurice Jones or Al Thomas, Jr., and therefore no *Monell* claim is stated against the City. With no undergirding constitutional violation in this case by Maurice Jones or Chief Thomas of Plaintiffs' First Amendment rights, the City simply has no §1983 municipal liability under *Monell*. *Turner* at 717.

Wherefore, the City of Charlottesville, Virginia requests that the Court dismiss all claims against it in the Complaint.


CITY OF CHARLOTTESVILLE
By Counsel


s/Richard H. Milnor
Richard H. Milnor, Esquire (VSB #14177)
Zunka, Milnor & Carter, Ltd.
414 Park Street
P O Box 1567
Charlottesville VA 22902
Telephone: (434) 977-0191
Facsimile: (434) 977-0198
rmilnor@zmc-law.com
*Counsel for City of Charlottesville*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of October, 2019, I electronically filed the foregoing Brief with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

s/Richard H. Milnor

16
Case 3:19-cv-00044-NKM-JCH   Document 39   Filed 10/25/19   Page 16 of 16   Pageid#: 432