IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

JASON KESSLER and
DAVID MATTHEW PARROTT,

   Plaintiffs,

v.                                      Case No. 3:19-cv-00044-NKM

CITY OF CHARLOTTESVILLE,
TARRON J. RICHARDSON,
AL S. THOMAS,
BECKY CRANNIS-CURL, and
MAURICE JONES,

   Defendants.

## BRIEF IN SUPPORT OF AL THOMAS'S MOTION TO DISMISS

### I. INTRODUCTION

Jason Kessler ("Kessler"), the organizer of the Unite the Right ("UTR") rally, along with David Matthew Parrott ("Parrott") (collectively "Plaintiffs") have sued the City of Charlottesville ("City"), current City Manager Tarron J. Richardson ("Richardson"), former Chief of Police Al Thomas ("Chief Thomas"), Virginia State Police Lieutenant Becky Crannis-Curl ("Lt. Crannis-Curl"), and former City Manager Maurice Jones ("Jones") (collectively "Defendants") for violation of their First Amendment rights to freedom of speech. Plaintiffs allege that on August 12, 2017, Defendants effectuated and acquiesced to a heckler's veto when they failed to quell violent counter-protestors in order to ensure that the UTR rally could occur as planned and, instead, declared an unlawful assembly and dispersed the entire crowd.

The Complaint against Chief Thomas should be dismissed in its entirety for several reasons. First, there was no violation of Plaintiffs' First Amendment rights to freedom of speech, as they were not entitled to protection, an unlawful assembly was declared and the entire crowd -

- protestors and counter-protestors alike -- dispersed. This dispersal was a content- and viewpoint-neutral restriction on speech. "The First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Second, Plaintiffs have not stated a claim for supervisory liability against Chief Thomas, and Chief Thomas is entitled to qualified immunity.

## II. ALLEGATIONS

Kessler obtained a permit to hold the UTR rally in the former Lee Park in Charlottesville on August 12, 2017. (ECF Doc. 1, at ¶¶ 72, 76.) The purpose of the rally was to oppose "a proposal by Charlottesville City Council to remove the statue of Confederate General Robert E. Lee from the former Lee Park in Charlottesville." (*Id.* at ¶¶ 8-9.) Kessler was scheduled to speak at the rally, and Parrott planned to engage in expressive political activity in support of Kessler and hear other persons scheduled to speak. (*Id.* at ¶¶ 9-10.)

Plaintiffs allege that, prior to the UTR rally, "Defendants were aware numerous known Antifa groups would be in Charlottesville for the specific purpose of imposing a heckler's veto on the Plaintiff's [sic] on August 12, 2017." (*Id.* at ¶ 31.) They also allege that, "[p]rior to August 12, 2017 Defendants had received intelligence that Antifa would be in attendance and planning to engage in violence by throwing soda cans filled with concrete." (*Id.* at ¶ 42.)

Plaintiffs allege that at the UTR rally on August 12, 2017, Chief Thomas issued a non-intervention order such that his officers did not intervene to stop the counter-protestors. (*Id.* at ¶¶ 29, 44, 46-47, 49.) Shortly after Kessler entered the park to prepare for the rally, "law enforcement declared an 'unlawful assembly' and all persons were ordered to leave the park." (*Id.* at 76.) While Kessler argued that he had a permit and should be allowed to stay, he was ordered out of the park and complied, leaving without incident. (*Id.*) After the unlawful

assembly declaration, Parrott "walked up to the Confederate statue on the hill to achieve a better vantage point for planning his group's exit from the park," and "[w]hile attempting to do so, . . . was arrested, detained, and transported to the jail . . . ." (*Id.* at ¶ 77.) Plaintiffs allege that they were "prevented from speaking, hearing other speakers, and demonstrating in support of [their] political opinions." They allege that "Defendants illegally permitted the heckler's veto and then used the chaos caused by Antifa to shut down Plaintiffs['] rally," and that they did so because of "public hostility to the content of Plaintiffs['] speech," thereby violating their First Amendment rights to freedom of speech.

While Plaintiffs' Complaint attempts to cast the Alt-Right as non-violent victims attacked by Antifa, the Independent Review of the 2017 Protest Events in Charlottesville, Virginia (hereinafter "Heaphy Report")[1], reveals the true picture—mutual combat and violence by both protestors and counter-protestors. *See* Independent Review of the 2017 Protest Events in Charlottesville, Virginia (hereinafter "Heaphy Report"), at 127, 130, 132, 133-34, 136, excerpts attached as Ex. 1.

- Unite the Right demonstrators pushed forward with their shields and hit the counter-protestors with flagpoles.

- Demonstrators violently jabb[ed] the poles at counter-protestors' faces.

- Counter-protestors fought back and tried to grab the flagpoles away.

---

[1] The Court can properly consider this document on a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. "[W]hen a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment. This ruling encompasses not only documents quoted, relied upon, or incorporated by reference in the complaint, but also official public records pertinent to the plaintiffs' claims." *Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995), *aff'd* 103 F.3d 351 (4th Cir. 1996); *Witthohn v. Federal Ins. Co.*, 164 F. App'x 395, 396 (4th Cir. 2006).

- Demonstrators pushed the counter-protestors away with brute force and a cloud of pepper spray.

- The demonstrators then used shields, flags, or fists to start skirmishes, all of which were eventually broken up by pepper spray.

- Bottles, balloons filled with unknown substances, and debris flew through the air. The clouds of pepper spray rose every few minutes.

- Other belligerent Alt-Right demonstrators remained at the southeast entrance, continuing to throw objects and hurl insults at their opponents in Market Street.

- [D]emonstrators and counter-protestors were fighting inside the park, and they engaged in more violent confrontations—throwing debris, attacking each other with sticks, and recklessly spraying pepper spray . . . .

- [A KKK leader] drew his handgun and pointed it at [a counter-protestor], while screaming at him to stop. [The KKK leader] loaded a round into the chamber of his gun then fired a single shot at the ground next to [the counter-protestor].

- One Unite the Right demonstrator walked up to [a counter-protestor] and punched her in the face.

*Id.* This was the reason Chief Thomas declared an unlawful assembly and ordered the crowd to be dispersed. While Plaintiffs allege only that Defendants had knowledge that Antifa would be present at the UTR rally to incite violence, they admit then ignore Defendants' knowledge that Alt-Right UTR rally attendees would also be violent. *Id.* at 70-72, 79.

### III. ARGUMENT

**A. Standard of Review.**

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is "to test the legal sufficiency of the complaint." *Randall v. U.S.,* 30 F.3d 518, 523 (4th Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is "plausible"

4

when the plaintiff pleads facts sufficient to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Twombly,* 550 U.S. at 556. A court should grant a motion to dismiss, however, where the allegations are nothing more than legal conclusions, or where the allegations permit a court to infer no more than a possibility of misconduct. *See Iqbal,* 556 U.S. at 678–79. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *See id.* at 678.

The Court need not accept legal conclusions that are presented as factual allegations, *Twombly*, 550 U.S. at 555, or "unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000). "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557); *see also, Tobey v. Jones,* 706 F.3d 379 at 387–88 (4th Cir. 2013).

B. **Plaintiffs have not stated a claim for violation of their First Amendment rights to free speech.**

In Count I, Plaintiffs allege that Thomas "ordered police officers to allow Antifa to impose a heckler's veto upon the Plaintiff[s]." (ECF Doc. 1, at ¶ 85.) They allege that the heckler's veto was permitted because of "public hostility to the content of Plaintiffs['] speech." (*Id.* at ¶¶ 78-79.) Plaintiffs' allegation that Thomas engaged in content and viewpoint-based restriction is a legal conclusion that is not accepted as true for the purposes of this motion. *Twombly*, 550 U.S. at 555.

5

### 1. **Thomas did not engage in a content and viewpoint-based restriction.**

Plaintiffs' assertion that Thomas engaged in content- and viewpoint-based restrictions of their speech rests upon the allegation that Thomas illegally permitted a heckler's veto. (ECF Doc. 1, at ¶¶ 78-79, 85.) It is true that, "[l]isteners' reaction to speech is not a content-neutral basis for regulation, or for taking an enforcement action against a peaceful speaker." *Bible Believers v. Wayne County, Mich.*, 805 F.3d 228, 247 (6th Cir. 2015) (citing *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966)). The heckler's veto is, thus, subject to strict scrutiny. *Id.* at 248 (citing *McCullen v. Coakley*, 134 S. Ct. 2518, 2530 (2014)).

> The rule to be followed is that when the police seek to enforce law and order, they must do so in a way that does not unnecessarily infringe upon the constitutional rights of law-abiding citizens. . . . **The police may** go against the hecklers, cordon off the speakers, or **attempt to disperse the entire crowd if that becomes necessary.** Moreover, they may take any appropriate action to maintain law and order that does not destroy the right to free speech by indefinitely silencing the speaker.

*Id.* (citing *Gregory v. City of Chicago*, 394 U.S. 111, 120 (1969)).

> A governmental entity may not permanently enjoin otherwise legal expression because of the threat of a hostile reaction from the public. Nevertheless, **governmental entities retain the right to regulate the use of public streets to protect legitimate government interests in maintaining public order and avoiding violence.** The reasonableness or necessity of the governmental action must be adjudged on the basis of the interest being protected, and the Government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word. Furthermore, **the First Amendment does not forbid a state from preventing imminent lawless action.**

*Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. Stuart*, 934 F.2d 318, 1991 WL 93048, at *2 (4th Cir. June 5, 1991) (internal quotations and citations omitted) (emphasis added).

In the present case, law enforcement declared an unlawful assembly. (ECF Doc. 1, at ¶ 76.) Plaintiffs have not challenged the validity of this declaration. The unlawful assembly statute provides, in relevant part,

> Whenever three or more persons assembled share the common intent to advance some lawful or unlawful purpose by the commission of an act or acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order, and the assembly actually tends to inspire persons of ordinary courage with well-grounded fear of serious and immediate breaches of public safety, peace or order, then such an assembly is an unlawful assembly.

Va. Code § 18.2-406. The United States District Court for the Eastern District of Virginia has held that the unlawful assembly statute does not violate First Amendment rights to freedom of speech. *United Steelworkers of Am., AFL-CIO-CLC v. Dalton*, 544 F. Supp. 282, 289 (1982). Section 18.2-406 "requires the existence of circumstances evidencing **a present threat of violence or breach of public order**. There is no doubt that the **states retain the right to maintain public order**. . . . On its face, [section] 18.2-406 does not impermissibly infringe upon plaintiffs' first amendment rights." *Id.* (Emphasis added).

The Supreme Court has also acknowledged the authority of police to regulate speech when there is a threat to public safety. "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace or order, appears, the power of the state to prevent or punish is obvious." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940). "The First Amendment does not protect violence." *Claiborne Hardware Co.*, 458 U.S. at 916.

The facts of the present case stand in contrast to those in *Bible Believers*. In *Bible Believers*, a self-described evangelical group attended the May 2012 Arab International Festival in Dearborn, Michigan to try and convert non-believers and call sinners to repent. 805 F.3d at 236-37. The group had attended the 2011 Festival where they had been permitted to occupy the

7

"free speech zone" on the first day of the festival, but were assaulted by festival goers and removed by the sheriff's office on the second day of the festival as they walked through the festival grounds. *Id.* at 236. In anticipation of the 2012 Festival, the Bible Believers sent a letter to the County and Sheriff identifying the problems from 2011 and advising the County that the group would be returning for the 2012 Festival. *Id.* at 236-37. The County responded by disagreeing with both the Bible Believers' version of events and the duties owed the group under the law. *Id.* at 237.

During the 2012 Festival, the group wore t-shirts with their messages, carried signs, and carried a severed pig's head on a spike. *Id.* at 238. The group preached to the Festival attendees, and onlookers began to throw plastic bottles and debris. *Id.* at 239. Each time a police officer would approach, the crowd would cease its assault. *Id.* at 239-40. Eventually the Bible Believers were removed from the festival grounds in lieu of being arrested for disorderly conduct. *Id.* at 240-41. Deputies informed the Bible Believers that they "were attracting a crowd and . . . affecting public safety." *Id.* at 240.

The United States District Court for the Eastern District of Michigan entered summary judgment in favor of the defendants, and the Bible Believers appealed to the Sixth Circuit Court of Appeals, which affirmed the decision of the District Court. *Id.* at 241-42. An en banc review followed, and the Sixth Circuit reversed the District Court's decision and entered summary judgment in favor of the Bible Believers. *Id.* at 242, 261-62. The Sixth Circuit determined that the County violated the Bible Believers' First Amendment rights by effectuating a heckler's veto and violated their free exercise rights and rights to equal protection. *Id.* at 255-57. The court also held that the individual deputies were not entitled to qualified immunity. *Id.* at 257-60.

8

The facts in this case are not like the situation in *Bible Believers*, where the peaceful protestors were removed from the event because of the violent actions of those opposing their speech, thereby violating the protestors' First Amendment rights by effectuating a heckler's veto. Here, law enforcement declared the unlawful assembly in reaction to violence from both the Alt-Right and Antifa. Neither the declaration of unlawful assembly nor the dispersing of both the UTR rally protestors and the counter-protestors violated Plaintiffs' First Amendment rights to freedom of speech. By its very nature, the dispersing of both the protestors and counter-protestors was a content- and viewpoint-neutral restriction on speech. While Plaintiffs attempt to paint a picture in which they and their Alt-Right compatriots were innocent victims of Antifa violence, the facts as outlined in the Heaphy Report (upon which Plaintiffs rely extensively to support their allegations) reveal that the UTR rally attendees were not "peaceful speakers" or "law-abiding citizens." Instead, they were engaged in violent, mutual combat with counter-protestors warranting the unlawful assembly declaration. *See* Heaphy Report, at 127, 130, 132, 133-34, 136. As such, the Count I does not state a claim and should be dismissed with prejudice.

2. **The First Amendment does not require police to protect Plaintiffs.**

The crux of Plaintiffs' First Amendment claim is that law enforcement did not take sufficient action to quell the counter-protestors, thereby permitting the UTR rally to proceed. Instead, Plaintiffs allege that law enforcement purposefully did nothing so that they could declare an unlawful assembly and disperse the entire crowd. (ECF Doc. 2, at ¶¶ 48-59, 72-79.)

While Plaintiffs do enjoy a First Amendment right to freedom of speech, they do not have a constitutional right to protection. **As the Fourth Circuit has held, "[T]here simply is 'no constitutional right to be protected by the state against . . . criminals or madmen,'" and a state actor's "'failure to do so is not actionable under section 1983.'"** *Doe v. Rosa*, 795 F.3d

9

429, 440 (citing *Fox v. Custis,* 712 F.2d 84, 88 (4th Cir. 1983); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir. 1982)); *see also Turner v. Thomas*, 313 F. Supp. 3d 704 (W.D. Va. 2018), *aff'd* 930 F.3d 640 (4th Cir. 2019).

Again, the facts of this case stand in stark contrast with those of *Bible Believers*. In *Bible Believers*, the protestors were peaceful and did not engage with the counter-protestors. As such, the Sixth Circuit concluded that there were less restrictive means available to the sheriff's deputies to maintain public order in lieu of removing the Bible Believers from the festival. *Bible Believers*, 805 F.3d at 254. The court noted that the County could have:

> [I]ncrease[d] police presence in the immediate vicinity, as was requested; erect[ed] a barricade for free speech, as was requested; arrest[ed] or threaten[ed] to arrest more of the law breakers, as was also requested; or allow[ed] the Bible Believers to speak from the already constructed barricade to which they were eventually secluded prior to being ejected from the Festival.

*Id.* The court also noted that the County could have called for backup if these measures were not feasible or were deemed unlikely to prevail before infringing on the group's First Amendment rights. *Id.*

In the present case, however, law enforcement officers were not faced with violent counter-protestors attacking peaceful protestors. Instead, there was mutual violence and fighting between both protestors and counter-protestors such that law enforcement observed "acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order" tending to inspire "serious and immediate breaches of public safety, peace or order." Va. Code § 18.2-406. These circumstances necessitated the dispersal of the entire crowd, not just one side or the other. This decision and the dispersal did not violate Plaintiffs' First Amendment rights to freedom of speech. As such, the Count I fails to state a claim and should be dismissed with prejudice.

10

C. **Plaintiffs have not stated a claim for supervisory liability.**

In Count V, Plaintiffs allege that Chief Thomas "was supervising all Charlottesville police officers at all relevant times" and "affirmatively caused the Charlottesville police to fail in their duty to not participate in, cause, or acquiesce in Antifa's heckler's veto of the Plaintiffs," and "omitted to perform his duty of not allowing Antifa to impose a heckler's veto on the plaintiff's event." (ECF Doc. 1, at ¶¶ 107-09.)

It is well-settled that "there is no respondeat superior liability under [Section 1983]." *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004), *cert. denied* 543 U.S. 813 (2004) (citing *Monell v. Dep't of Soc. Srvs.*, 436 U.S. 658 (1978)). Given that limitation, supervisors can only be held liable in their individual capacities for their personal wrongdoing or supervisory actions that violated constitutional norms. *Harbeck v. Smith*, 814 F. Supp. 2d 608, 627 (E.D. Va. 2011).

In *Iqbal*, the Supreme Court specifically rejected a claim based on a supposed theory of "supervisory liability." The plaintiff in *Iqbal* argued that the supervisors' knowledge and acquiescence in their subordinate's discriminatory actions amounted to the supervisors' violation of the Constitution. The Supreme Court expressly rejected the argument:

> Respondent's conception of "supervisory responsibility" is inconsistent with his accurate stipulation that petitioners may not be held responsible for the misdeeds of their agents. In a § 1983 suit or a *Bivens* action – where masters do not answer for the torts of their servants – the term "supervisory liability" is a misnomer. Absent vicarious liability each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.

*Iqbal*, 556 U.S. at 677.

The Fourth Circuit has established a three-part test for holding supervisory officials individually liable under § 1983: (i) the supervisor must have actual or constructive knowledge that his subordinate was engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury to citizens like plaintiff, (ii) the supervisor's response to that knowledge

must be so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices" and (iii) there must be an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the Plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

> Under the first prong of *Shaw,* the conduct engaged in by the supervisor's subordinates must be **pervasive,** meaning that the **"conduct is widespread, or at least has been used on several different occasions."** Furthermore, in establishing deliberate indifference under *Shaw's* second prong, a plaintiff ordinarily . . . **cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct**. Deliberate indifference, however, may be satisfied by showing a supervisor's continued inaction in the face of documented widespread abuses.

*Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (internal quotations and citations omitted). Therefore, "in order to impute supervisory liability, the plaintiff must be able to identify a systematic practice . . . and that supervisors either encouraged the practice or did nothing to address it once they became aware of it." *Climan v. Reeves,* No. 06-1099, 2007 WL 1815548, at *4 (E.D. Va. June 20, 2007).

Plaintiffs base their supervisory liability claim on an alleged failure of police officers to intervene to stop counter-protestors and, thus, permit the UTR rally to proceed. For the reasons stated above, inaction on the part of law enforcement cannot support a claim since there is no constitutional right to be protected. *See supra* Part III.B.2. Moreover, even if Chief Thomas was aware of an alleged failure to intervene on the part of a subordinate officer, he cannot be held liable since there is no constitutional right to be protected by the state against "criminals or madmen." *Id.* Therefore, Count V should be dismissed with prejudice.

**D.      Chief Thomas is entitled to qualified immunity**

Chief Thomas is entitled to qualified immunity as to all claims asserted by Plaintiffs, because he did not violate a clearly established right. Qualified immunity provides immunity from suit rather than a mere defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). **Thus, it should be resolved at the earliest possible stage of litigation.** *Anderson v. Creighton*, 483 U.S. 635, 646, n.6 (1987) (emphasis added). Indeed, qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017). **The safe harbor of qualified immunity ensures that public employees will not be liable for bad guesses in gray areas, but only for transgressing bright lines.** *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (emphasis added).

The Supreme Court has outlined a two-pronged test governing qualified immunity. The first prong considers whether the facts, viewed in the light most favorable to the plaintiff, make out a violation of a Constitutional right. If they do, the second prong considers whether the constitutional right in question was "clearly established" at the time of the defendants' alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009). The Court has discretion to determine which prong to address first. *Hunsberger v. Wood*, 570 F.3d 546, 552 (4th Cir. 2009).

A clearly established right is not discussed in a generalized fashion, but instead must be defined at a high level of particularity. *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003). **The Supreme Court recently reiterated that "clearly established law must be 'particularized' to the facts of the case . . . [o]therwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."** *White*, 137 S. Ct. 548, 552 (2017) (emphasis added).

> [A] court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted. If so, then the

>defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however—*i.e.,* if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability.

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

"A government official violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear such that every reasonable official would understand that what he is doing violates that right—in other words, the legal question must be 'beyond debate.'" *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 725 (E.D. Va. 2015) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)).  In the Fourth Circuit, the general rule is that only the decisions of the Supreme Court, the Fourth Circuit, and the highest court of the state in which the conduct occurred are relevant. *Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.,* 597 F.3d 163, 176 (4th Cir. 2010).

For the reasons stated *supra*, the allegations in the Complaint do not set forth a Constitutional violation.  As such, the qualified immunity inquiry can end without addressing the second prong.  Nevertheless, it was not clearly established in August 2017 that Chief Thomas would violate Plaintiffs' Constitutional rights by declaring an unlawful assembly in the wake of violence and fighting amongst protestors and counter-protestors, and dispersing the entire crowd. In fact, such actions have been deemed proper. *See Johnson v. City of Seattle*, 474 F.3d 634, 641 (9th Cir. 2007).

Since August 2017, the Fourth Circuit has concluded that Chief Thomas was entitled to qualified immunity, because it "was not clearly established at the time of the rally that ordering officers not to intervene in private violence between protestors was an affirmative act within the state-created danger doctrine." *Turner*, 930 F.3d at 646.  Once again, Chief Thomas is entitled to qualified immunity, and the Complaint against him should be dismissed with prejudice.

14

## IV. CONCLUSION

For all of the foregoing reasons, Al Thomas, by counsel, respectfully requests that this Court grant his Motion to Dismiss and dismiss the Complaint against him with prejudice.

AL THOMAS

By Counsel

/s/ David P. Corrigan
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
Attorney(s) for Al Thomas
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com

## **C E R T I F I C A T E**

   I hereby certify that on the 25th day of October, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

   Elmer Woodard, Esq.      James E. Kolenich, Esq.
   Attorney at Law, P.C.      Kolenich Law Office
   5661 US Hwy. 29        9435 Waterstone Boulevard
   Blairs, VA 24527        #140
   434-878-3422 - Phone     Cincinnati, OH 45249
   434-793-0675 - Fax       513-444-2150 - Phone
   isuecrooks@comcast.net     5132976065 - Fax
                   jek318@gmail.com

   Richard H. Milnor, Esq.     Erin R. McNeil, Esq.
   VSB No. 14177        Office of the Attorney General
   Zunka, Milnor & Carter, Ltd.   202 North 9th Street
   P.O. Box 1567         Richmond, VA 23219
   Charlottesville, VA 22902    804-786-0046 – Phone
   434-977-0191 x34 - Phone   804-646-3500 – Phone
   434-977-0198 - Fax      804-371-2087 – Fax
   RMilnor@zmc-law.com     emcneil@oag.state.va.us

   Rosalie Pemberton Fessier
   Brittany Elizabeth Shipley
   Timberlake Smith
   P.O. Box. 108
   Staunton, VA 2440
   540-885-1517
   540-885-4537
   rfessier@timberlakesmith.com
   bshipley@timberlakesmith.com

                  /s/ David P. Corrigan
                  David P. Corrigan (VSB No. 26341)
                  Melissa Y. York (VSB No. 77493)
                  Attorney(s) for Al Thomas
                  Harman, Claytor, Corrigan & Wellman
                  P.O. Box 70280
                  Richmond, Virginia 23255
                  804-747-5200 - Phone
                  804-747-6085 - Fax
                  dcorrigan@hccw.com
                  myork@hccw.com