IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

JASON KESSLER AND DAVID MATTHEW
PARROT,

  Plaintiffs,

v.                                            Case No. 3:19-cv-00044-NKM

CITY OF CHARLOTTESVILLE AND
TARRON J. RICHARDSON, IN HIS
OFFICIAL CAPACITY AND AL S.
THOMAS, IN HIS INDIVIDUAL
CAPACITY AND BECKY CRANNIS-CURL,
IN HER INDIVIDUAL CAPACITY AND
MAURICE JONES, IN HIS INDIVIDUAL
CAPACITY,

  Defendants.

## REPLY BRIEF IN SUPPORT OF AL THOMAS'S MOTION TO DISMISS

### I.    INTRODUCTION

Jason Kessler ("Kessler") and David Matthew Parrott ("Parrott") (collectively "Plaintiffs") oppose Al Thomas's ("Chief Thomas") Motion to Dismiss although they do not actually address the issues raised therein. Instead, Plaintiffs argue in conclusory fashion, and without citation to authority, that Chief Thomas ratified and effectuated a heckler's veto through actions which do not meet the strict scrutiny test and were not the least restrictive means, thereby violating their First Amendment rights. They are wrong.

Because Chief Thomas declared an unlawful assembly and dispersed both the Alt-Right and Antifa, he did not engage in a content or viewpoint-based restriction, and his actions are not subject to strict scrutiny. Chief Thomas's actions on August 12, 2017 did not burden any more speech than necessary to meet the important and substantial government interest of protecting the

1

public safety, peace, and order. "The First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). Furthermore, Plaintiffs were not entitled to police protection of their First Amendment rights, and Chief Thomas is entitled to qualified immunity, because it was not clearly established that his actions would violate Plaintiffs' constitutional rights. The Complaint against Chief Thomas should be dismissed in its entirety and with prejudice.

## II. ARGUMENT

### A. Strict scrutiny does not apply.

Plaintiffs ignore Chief Thomas's argument that he did not engage in content and viewpoint-based restrictions and merely argue that they were engaged in protected speech that is subject to strict scrutiny requiring any government action to meet the least restrictive means available. (ECF Doc. 47, at 3.) Plaintiffs' assertion that Thomas engaged in content- and viewpoint-based restrictions of their speech rests upon the allegation that Chief Thomas illegally permitted a heckler's veto. (ECF Doc. 1, at ¶¶ 78-79, 85.) This, however, is a legal conclusion not accepted as true for the purposes of the Motion to Dismiss.

Strict scrutiny applies only when the government is restricting speech based on content or viewpoint. *See U.S. v. Playboy Entertainment Grp.*, 529 U.S. 803, 813 (2000) (citing *Sable Commc'ns of Calif., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)). If the restriction is content or viewpoint-neutral, intermediate scrutiny applies. *Doe v. Cooper*, 842 F.3d 833, 846 (4th Cir. 2016).

> To pass intermediate scrutiny, the [government conduct] must "materially advance[ ] an important or substantial [government] interest by redressing past harms or preventing future ones.' In addition, it must have the right "fit." That is, it cannot "burden substantially more speech than is necessary to further the government's legitimate interests."

*Id.* (quoting *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1082 (4th Cir. 2006); *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

In the present case, law enforcement declared the unlawful assembly in reaction to violence from both the Alt-Right and Antifa. (ECF Doc. 1, at ¶ 76.) Neither the declaration of unlawful assembly nor the dispersing of both the UTR rally protestors and the counter-protestors violated Plaintiffs' First Amendment rights to freedom of speech. By its very nature, the dispersing of both the protestors and counter-protestors was a content- and viewpoint-neutral restriction on speech. As such, Chief Thomas's actions are not subject to strict scrutiny.

The declaration of an unlawful assembly and dispersing of all sides meets the intermediate scrutiny test. The unlawful assembly statute provides, in relevant part,

> Whenever three or more persons assembled share the common intent to advance some lawful or unlawful purpose by the commission of an act or acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order, and the assembly actually tends to inspire persons of ordinary courage with well-grounded fear of serious and immediate breaches of public safety, peace or order, then such an assembly is an unlawful assembly.

Va. Code § 18.2-406. The United States District Court for the Eastern District of Virginia has held that the unlawful assembly statute does not violate First Amendment rights to freedom of speech. *United Steelworkers of Am., AFL-CIO-CLC v. Dalton*, 544 F. Supp. 282, 289 (1982). Section 18.2-406 "requires the existence of circumstances evidencing **a present threat of violence or breach of public order**. There is no doubt that the **states retain the right to maintain public order**. . . . On its face, [section] 18.2-406 does not impermissibly infringe upon plaintiffs' first amendment rights." *Id.* (Emphasis added).

The Supreme Court has also acknowledged the authority of police to regulate speech when there is a threat to public safety. "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace

or order, appears, the power of the state to prevent or punish is obvious." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940). "The First Amendment does not protect violence." *Claiborne Hardware Co.*, 458 U.S. at 916.

Violence was widespread and public safety, peace, and order were in jeopardy on August 12, 2017 when law enforcement declared the unlawful assembly. Protecting the public and keeping the peace are important and substantial governmental interests. Dispersing both the Alt-Right and Antifa did not burden any more speech than was necessary to further the interest of public safety, peace, and order. As such, the actions of August 12, 2017 meet the intermediate scrutiny test, and Plaintiffs have not stated a claim for violation of their First Amendment rights.

## B. There was no heckler's veto.

Plaintiffs argue, absent citation to authority, that Chief Thomas "had a clearly established, constitutionally mandated duty to protect Plaintiffs free speech rights on August 12, 2017." (ECF Doc. 47, at 3.) This is not accurate, as explained *infra*, and ignores the stark contrast of the facts in the present case with those in *Bible Believers v. Wayne County, Mich.*, 805 F.3d 228 (6th Cir. 2015).

In *Bible Believers*, a self-described evangelical group attended the May 2012 Arab International Festival in Dearborn, Michigan to try and convert non-believers and call sinners to repent. *Id.* at 236-37. The group wore t-shirts with their messages, carried signs, and carried a severed pig's head on a spike. *Id.* at 238. The group preached to the Festival attendees, and onlookers began to throw plastic bottles and debris. *Id.* at 239. Each time a police officer would approach, the crowd would cease its assault. *Id.* at 239-40. Eventually the Bible Believers were removed from the festival grounds in lieu of being arrested for disorderly conduct. *Id.* at 240-41.

4

Deputies informed the Bible Believers that they "were attracting a crowd and . . . affecting public safety." *Id.* at 240.

The United States District Court for the Eastern District of Michigan entered summary judgment in favor of the defendants, and the Bible Believers appealed to the Sixth Circuit Court of Appeals, which affirmed the decision of the District Court. *Id.* at 241-42. An en banc review followed, and the Sixth Circuit reversed the District Court's decision and entered summary judgment in favor of the Bible Believers. *Id.* at 242, 261-62. The Sixth Circuit determined that the County violated the Bible Believers' First Amendment rights by effectuating a heckler's veto. *Id.* at 255-57. In so holding, the Sixth Circuit concluded that there were less restrictive means available to the sheriff's deputies to maintain public order in lieu of removing the Bible Believers from the festival. *Id.* at 254. The court concluded that the County could have:

> [I]ncrease[d] police presence in the immediate vicinity, as was requested; erect[ed] a barricade for free speech, as was requested; arrest[ed] or threaten[ed] to arrest more of the law breakers, as was also requested; or allow[ed] the Bible Believers to speak from the already constructed barricade to which they were eventually secluded prior to being ejected from the Festival.

*Id.* The court also noted that the County could have called for backup if these measures were not feasible or were deemed unlikely to prevail before infringing on the group's First Amendment rights. *Id.*

The facts in this case are readily distinguishable from the situation in *Bible Believers*, yet consistent with the Sixth Circuit's holding.

> The rule to be followed is that when the police seek to enforce law and order, they must do so in a way that does not unnecessarily infringe upon the constitutional rights of law-abiding citizens. . . . **The police may** go against the hecklers, cordon off the speakers, or **attempt to disperse the entire crowd if that becomes necessary.** Moreover, they may take any appropriate action to maintain law and order that does not destroy the right to free speech by indefinitely silencing the speaker.

*Id.* (citing *Gregory v. City of Chicago*, 394 U.S. 111, 120 (1969)). Here, law enforcement officers were not faced with violent counter-protestors attacking peaceful protestors. Instead, there was mutual violence and fighting between both protestors and counter-protestors such that law enforcement observed "acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order" tending to inspire "serious and immediate breaches of public safety, peace or order." Va. Code § 18.2-406. These circumstances necessitated the dispersal of the entire crowd, not just one side or the other. This decision and the dispersal did not constitute a heckler's veto or violate Plaintiffs' First Amendment rights to freedom of speech. "**[G]overnmental entities retain the right to regulate the use of public streets to protect legitimate government interests in maintaining public order and avoiding violence. . . . [T]he First Amendment does not forbid a state from preventing imminent lawless action.**" *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. Stuart*, 934 F.2d 318, 1991 WL 93048, at *2 (4th Cir. June 5, 1991) (internal quotations and citations omitted) (emphasis added).

### C. The First Amendment does not require police to protect Plaintiffs.

While Plaintiffs do enjoy a First Amendment right to freedom of speech, they do not have a constitutional right to protection. **As the Fourth Circuit has held, "[T]here simply is 'no constitutional right to be protected by the state against . . . criminals or madmen,'" and a state actor's "'failure to do so is not actionable under section 1983.'"** *Doe v. Rosa*, 795 F.3d 429, 440 (4th Cir. 2015) (citing *Fox v. Custis,* 712 F.2d 84, 88 (4th Cir. 1983); *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir. 1982)); *see also Turner v. Thomas*, 313 F. Supp. 3d 704 (W.D. Va. 2018), *aff'd* 930 F.3d 640 (4th Cir. 2019).

Plaintiffs argue, absent citation to authority, that Chief Thomas "had an affirmative duty to take action to protect Plaintiffs' free speech rights . . . ." (ECF Doc. 47, at 4.) Plaintiffs

6

further argue that the case law establishing that there is no constitutional right to protection does not apply since it does not address a First Amendment right to free speech. This argument fails to acknowledge that the Supreme Court has generally declined to find that the Constitution imposes affirmative obligations on the government to help citizens. In the Fourteenth Amendment context, the Supreme Court has recognized that the prohibition, "'[n]o State shall ... deprive any person of life, liberty, or property, without due process of law' . . . does not require the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 195 (1989) (quoting U.S. Const. amend. XIV).

> **The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.** It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but **its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.** . . . **Its purpose was to protect the people from the State, not to ensure that the State protected them from each other.**

*Id.* at 195-96 (internal citations omitted) (emphasis added).

> Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer **no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual**. . . . "Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference . . . . , it does not confer an entitlement to such [governmental aid] as may be necessary to realize all the advantages of that freedom." . . . **[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause**.

*Id.* at 196-97 (internal citations omitted) (emphasis added).

Similarly, the First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the

7

Government for a redress of grievances." U.S. Const. amend. I. There is no reason to believe that there is a greater obligation on the government to protect the rights guaranteed under the First Amendment than those guaranteed under the Fourteenth Amendment. As such, Plaintiffs were not entitled to police protection of their First Amendment rights under these circumstances.

**D.    Plaintiffs have not stated a claim for supervisory liability.**

Plaintiffs have not responded to Chief Thomas's arguments regarding supervisory liability. Instead, they merely cite the standard announced in *Shaw v. Stroud*, 13 F.3d 791, 798-99 (4th Cir. 1994), and state that they have alleged that Chief Thomas "intentionally ordered the state actors under their supervision to violate clearly established duties toward the Plaintiffs." (ECF Doc. 47, at 4.) For the reasons stated *supra*, as well as in Chief Thomas's Brief in Support, Plaintiffs have not stated a claim for supervisory liability.

**E.    Chief Thomas is entitled to qualified immunity.**

Plaintiffs argue that Chief Thomas is not entitled to qualified immunity, because they have demonstrated "the existence of a clearly established constitutional right and corresponding affirmative duty on the part of Defendants regarding the heckler's veto." (ECF Doc. 47, at 5.) Relying on *Hutchinson v. Lemmon*, 436 F. App'x 210, 215 (4th Cir. 2011), Plaintiffs argue that "[t]here is no requirement that the precise right allegedly violated already have been recognized specifically by a court before such right may be held 'clearly established for qualified immunity purposes.'" (ECF Doc. 47, at 5.)

Since the *Hutchinson* case, however, the Supreme Court has held that **"clearly established law must be 'particularized' to the facts of the case . . . [o]therwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually**
8

**unqualified liability simply by alleging violation of extremely abstract rights."** *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (emphasis added).

> [A] court must ask whether it would have been clear to a reasonable officer that **the alleged conduct was unlawful in the situation he confronted.** If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity. If not, however— *i.e.,* if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability.

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (emphasis added).

"A government official violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear such that every reasonable official would understand that what he is doing violates that right—in other words, the legal question must be 'beyond debate.'" *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 725 (E.D. Va. 2015) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)). In the Fourth Circuit, the general rule is that only the decisions of the Supreme Court, the Fourth Circuit, and the highest court of the state in which the conduct occurred are relevant. *Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.,* 597 F.3d 163, 176 (4th Cir. 2010).

Contrary to Plaintiffs' allegations, it is not sufficient for qualified immunity purposes that a heckler's veto has been recognized as a violation of First Amendment rights of free speech. For Chief Thomas to lose qualified immunity, the actual conduct complained of—declaring an unlawful assembly in the wake of violence and fighting amongst protestors and counter-protestors, and dispersing the entire crowd—must have been clearly established as a constitutional violation. Not only was it not clearly established in August 2017 that such conduct would violate Plaintiffs' constitutional rights, such actions have actually been deemed proper. *See Johnson v. City of Seattle*, 474 F.3d 634, 641 (9th Cir. 2007). As such, Chief Thomas is

9
Case 3:19-cv-00044-NKM-JCH    Document 48    Filed 11/14/19    Page 9 of 11    Pageid#: 502

entitled to qualified immunity, and the Complaint against him should be dismissed with prejudice.

### III.     CONCLUSION

For all of the foregoing reasons, as well as those in the Brief in Support of Al Thomas's Motion to Dismiss, Al Thomas, by counsel, respectfully requests that this Court grant his Motion to Dismiss and dismiss the Complaint against him with prejudice.

**AL THOMAS**

By Counsel

/s/ David P. Corrigan
David P. Corrigan (VSB No. 26341)
Melissa Y. York (VSB No. 77493)
Attorney(s) for Al Thomas
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
dcorrigan@hccw.com
myork@hccw.com

# **C E R T I F I C A T E**

       I hereby certify that on the 14th day of November, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Elmer Woodard, Esq.
Attorney at Law, P.C.
5661 US Hwy. 29
Blairs, VA 24527
434-878-3422 - Phone
434-793-0675 - Fax
isuecrooks@comcast.net

James E. Kolenich, Esq.
Kolenich Law Office
9435 Waterstone Boulevard
#140
Cincinnati, OH 45249
513-444-2150 - Phone
5132976065 - Fax
jek318@gmail.com

Richard H. Milnor, Esq.
VSB No. 14177
Zunka, Milnor & Carter, Ltd.
P.O. Box 1567
Charlottesville, VA 22902
434-977-0191 x34 - Phone
434-977-0198 - Fax
RMilnor@zmc-law.com

Erin R. McNeil, Esq.
Office of the Attorney General
202 North 9th Street
Richmond, VA 23219
804-786-0046 – Phone
804-646-3500 – Phone
804-371-2087 – Fax
emcneil@oag.state.va.us

Rosalie Pemberton Fessier
Brittany Elizabeth Shipley
Timberlake Smith
P.O. Box. 108
Staunton, VA 2440
540-885-1517
540-885-4537
rfessier@timberlakesmith.com
bshipley@timberlakesmith.com

                /s/ David P. Corrigan
                David P. Corrigan (VSB No. 26341)
                Melissa Y. York (VSB No. 77493)
                Attorney(s) for Al Thomas
                Harman, Claytor, Corrigan & Wellman
                P.O. Box 70280
                Richmond, Virginia 23255
                804-747-5200 - Phone
                804-747-6085 - Fax
                dcorrigan@hccw.com
                myork@hccw.com