CLERK'S OFFICE U.S. D'ST. COURT
AT CHARLOTTESVILE, VA
FILED

FEB 2 1 2020

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| JASON KESSLER, *et al.*, | CASE NO. 3:19-cv-00044 |
| *Plaintiffs,* |  |
| v. | MEMORANDUM OPINION |
| CITY OF CHARLOTTESVILLE, *et al.*, |  |
| *Defendants.* | JUDGE NORMAN K. MOON |

## INTRODUCTION

Before the Court are five motions to dismiss Plaintiffs' complaint for failure to state a claim. The claims against each Defendant are based on substantially the same theory.[1] Namely, Plaintiffs allege that Defendants—the City of Charlottesville, Charlottesville's then-city manager and then-chief of police, a Virginia State Police Lieutenant, and Charlottesville's current city manager—unconstitutionally effectuated a "heckler's veto" of the Unite the Right rally in Charlottesville, Virginia, on August 12, 2017, which Plaintiff Jason Kessler organized, and Plaintiff David Matthew Parrott attended.

Where the state suppresses speech based on the threat, or possibility, of a hostile or violent response from the audience, it can be said to have effectuated a "heckler's veto." In this case, Plaintiffs allege that Defendants used the expected chaos and violence caused by the confrontations between "Antifa" counter-protestors and Alt-Right protestors as grounds to shut down Plaintiffs' rally—thereby restricting Plaintiffs' speech based on the hostile public reaction to the message of the event. In doing so, Plaintiffs allege that Defendants violated their First Amendment rights.

---

[1] Plaintiffs themselves recognize that "[a]ll other claims live or die based on the viability of [their] heckler's veto claim." Dkt. 47 at 8.

In Count I, Plaintiffs plead that then-Charlottesville Chief of Police Defendant Al S. Thomas, acting in his individual capacity, violated their First Amendment rights by ordering Charlottesville police officers to allow counter-protestors at the August 2017 "Unite the Right" rally to impose a heckler's veto upon Plaintiffs. They also allege in Count V that Defendant Thomas is liable on a supervisory liability theory under Section 1983 because he affirmatively caused Charlottesville police to "fail in their duty to not participate in, cause, or acquiesce" in counter-protestors' heckler's veto.

In Count II, Plaintiffs allege that Virginia State Police Lieutenant Defendant Becky Crannis-Curl, in her individual capacity, is liable to Plaintiffs under Section 1983 because she ordered Virginia State Troopers to permit counter-protestors to impose a heckler's veto upon Plaintiffs, pursuant to a stand-down order, in violation of their First Amendment rights. Like their claim against Defendant Thomas, Plaintiffs also allege in Count VI that Defendant Crannis-Curl is liable under a supervisory liability of Section 1983 because she "affirmatively caused the Virginia State Troopers to "fail in their duty to not participate in, cause, or acquiesce" in the counter-protestors' heckler's veto.

Plaintiffs plead in Count III that then-Charlottesville City Manager Defendant Maurice Jones, in his individual capacity, also ordered, acquiesced in, or otherwise approved Defendant Thomas's plan to permit the counter-protestors to impose a heckler's veto upon Plaintiffs' event, thereby using "the resulting chaos as an excuse to declare an unlawful assembly" in violation of Plaintiffs' First Amendment rights. Plaintiffs also allege a *Monell* claim against Defendant City of Charlottesville in Count IV of their complaint, arguing that Charlottesville is liable for Jones's alleged ratification of the stand-down order Thomas issued to police in order to make it "easier to

declare an unlawful assembly."[2] Plaintiffs argue that this policy, and the subsequent declaration of an unlawful assembly in accordance with it, unconstitutionally effectuated a heckler's veto in violation of their First Amendment rights.

Because of the procedural posture of this case, the Court is required to accept as true the allegations in Plaintiffs' complaint when considering Defendants' motion to dismiss. Even still, Plaintiffs' claims fail as a matter of law because Plaintiffs have not alleged any violation of their constitutional rights. Accordingly, Defendants' motions to dismiss will be granted.

## I.   STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In evaluating a motion to dismiss under Rule 12(b)(6), the Court must accept all of the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor, *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a

---

[2] Defendant Tarron Richardson, the current city manager of Charlottesville, is sued in his official capacity. There are no allegations in the complaint against him in his individual capacity, and he is not indicated in any of the counts against the other Defendants. "[A] suit against a governmental officer in his official capacity is the same as a suit against [the] entity of which [the] officer is an agent," so "victory in such an official-capacity suit imposes liability on the entity that [the officer] represents." *McMillian v. Monroe Cty.*, 520 U.S. 781, 785 n.2 (1997). As Plaintiffs have sued the City of Charlottesville in this action, Richardson is considered a duplicative defendant. The parties, in the briefing on the motion to dismiss, have agreed to Richardson's dismissal from the case. Dkt. 47 at 9. Thus, the Court will grant Richardson's motion to dismiss, Dkt. 40.

formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (quotation marks omitted). This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics," instead the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("only a complaint that states a plausible claim for relief survives a motion to dismiss").

A court may consider a document outside the complaint when evaluating a motion to dismiss if the document is authentic and integral to the complaint. *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016). In their complaint, Plaintiffs extensively quote from and cite to the Independent Review of the 2017 Protest Events in Charlottesville, Virginia, conducted by Timothy Heaphy of the law firm then known as Hunton & Williams LLP ("Heaphy Report")—citing the document over a dozen times in their nineteen-page complaint. *Cf. Goines*, 822 F.3d at 164 ("Although the complaint included a few quotes from and references to the Incident Report, Goines' claims do not turn on, nor are they otherwise based on, statements contained in the Incident Report."). Such references include, but are not limited to, Defendant Al Thomas's directive, "Let them fight, it will make it easier to declare an unlawful assembly." Dkt. 1 at ¶ 51 (citing Heaphy Report p. 133). Plaintiffs failed to attach this report to the complaint, but Defendant Thomas attached certain portions of this report to his motion to dismiss. Dkt. 43-1, Ex. 1. At the hearing on these motions to dismiss, counsel for each of the parties affirmatively and expressly indicated their consent to the Court considering the report when evaluating the pending motions to dismiss.

4

Considering the complaint not only extensively relies on direct quotations and information from the report, but further, that Plaintiffs' claims clearly and directly turn on such quotations and information cited from the Heaphy Report, the Court finds that Plaintiffs have incorporated it into their complaint. The Court has determined that it is integral to the complaint, *see Goines*, 822 F.3d at 166, and the parties have not disputed the Report's authenticity. What is more, all parties have consented to the Court considering it. Consequently, although the Court finds that the allegations within the complaint itself are sufficient to support its ruling, the Court also will consider the Heaphy Report in its review of the motions to dismiss.

## II.   ALLEGED FACTUAL BACKGROUND

On August 12, 2017, Plaintiff Jason Kessler planned to hold, pursuant to a permit, the "Unite the Right" ("UTR") rally in Charlottesville, Virginia. Dkt. 1 at ¶ 72. Kessler alleges that he planned to "speak, hear others speak, and engage in expressive political activity" in opposition to the Charlottesville City Council's proposal to remove a Confederate statue from the formerly named Lee Park in Charlottesville. *Id.* at ¶ 9. Plaintiff David Matthew Parrott alleges that he attended the UTR rally in order to engage in "expressive political activity" in support of Kessler as well as observe the speaking presentations planned for the event. *Id.* at ¶ 10. Plaintiffs allege that their "Alt-Right" message, *id.* at ¶ 11, which was to be showcased at the UTR rally, is considered by many "to be offensive due to its liberal use of racially and religiously offensive language," *id.* at ¶ 12.

Plaintiffs allege that, among the various groups of counter-protesters, Antifa, a group "who dislike Alt-Right political messaging," *id.* at ¶ 13, attended the UTR rally in order to "stop or attempt to stop" Plaintiffs from expressing their Alt-Right message at the event. *Id.* at ¶ 16. Plaintiffs provide a variety of allegations about Antifa's "violent rhetoric" against Alt-Right and

politically conservative speakers at rallies and events across the country prior to the August 12 UTR rally in Charlottesville. *Id.* at ¶¶ 23–27. Plaintiffs further contend that Defendants in this case were aware of Antifa's "violent history and tactics," *id.* at ¶¶ 27, 30, as well as their intentions for the UTR rally planned in Charlottesville. *Id.* at ¶ 31. Specifically, Plaintiffs allege that Defendants were aware that Antifa-associated groups intended to impose a "heckler's veto" on Kessler's event. *Id.*

In order to establish Antifa's violent intentions for the UTR rally, Plaintiffs allege that, in the time leading up to the event: a video was posted to YouTube "of Antifa members firing live ammunition at targets painted with Alt-Right symbols," *id.* at ¶ 34; an Antifa group named "Redneck Revolt" posted a "Call to Arms" online, calling on Antifa groups to "dust off the guns of 1921" allegedly in reference to "an incident in 1921 where armed Communists murdered military and law enforcement personnel," *id.* at ¶ 35; an Antifa group named "South Side ARA" allegedly encouraged their members to punch Richard Spencer (an Alt-Right speaker scheduled to present at the UTR rally in Charlottesville), *id.* at ¶ 36; and an Antifa group named "Philly ARA" called for the UTR rally in Charlottesville to be "shut down and their political opponents to be 'completely neutralized on the streets,'" advising its supporters that "offensive violence [was] completely legal because the best defense is a good offense," *id.* at ¶ 37 (internal quotations omitted).

In their complaint, Plaintiffs allege that Antifa members undertook acts of violence against Alt-Right protestors on August 12, 2017, including attacks with baseball bats, mace spray, canes, sticks, bricks, bottles, and a metal pipe. *Id.* at ¶¶ 53–57. But Plaintiffs themselves allege that the violence was not solely attributable to Antifa: their complaint states that "people were hurt and beaten on both sides." *Id.* at ¶ 58. Moreover, according to the Heaphy Report, which the parties

6

agreed the complaint incorporated by reference, "Unite the Right demonstrators pushed forward with their shields and hit the counter-protestors with flagpoles. Open source video footage shows demonstrators violently jabbing the poles at counter-protestors' faces. Eventually, the demonstrators pushed the counter-protestors away with brute force and a cloud of pepper spray." Dkt. 43-1, Ex. 1 at 7 (Heaphy Report at 130). The Heaphy Report indicates that, not long before the unlawful assembly was declared, "demonstrators and counter-protestors were fighting inside the park, and they engaged in more violent confrontations—throwing debris, attacking each other with sticks, and recklessly spraying pepper spray . . . ." *Id.* at 10 (Heaphy Report at 134). [3]

Plaintiffs allege that Defendants were briefed prior to August 12, 2017, by regional law enforcement on those Antifa groups that were expected in Charlottesville during the UTR rally. *Id.* at ¶ 41. They also allegedly received intelligence that the Antifa groups expected to be in attendance had plans "to engage in violence by throwing soda cans filled with concrete." *Id.* at ¶ 42.

Defendant Thomas was the Chief of the Police for Charlottesville, VA, during all relevant times. *Id.* at ¶ 5. Plaintiffs allege that Thomas stated he would not protect rally participants from Antifa groups at the UTR rally on August 12 after the police's experience separating Alt-Right speakers and Antifa members engaged in violence during a smaller rally held in Charlottesville on July 8, 2017. *Id.* at ¶ 29. After that event, Plaintiffs allege that Thomas told his subordinate officers, "I'm not going to get [Alt-Right] in and out" of the UTR rally on August 12. *Id.* at ¶ 47 (alteration in original). Plaintiffs further allege that, prior to August 12, 2017, Thomas communicated with Defendant Maurice Jones (the City Manager for Charlottesville at all relevant times alleged in the

---

[3] In fact, this information appears just one page after that which Plaintiffs cite for Chief Thomas's directive to "let them fight, it will make it easier to declare an unlawful assembly." Dkt. 1 at ¶ 52 (citing Heaphy Report at 133).

7

complaint), *id.* at ¶ 61, about Antifa's planned disruptive violence, and that Jones "knew of and approved of [Thomas's] orders that his police not prevent Antifa from violently imposing a heckler's veto on the Alt-Right on August 12, 2017." *Id.* As support for this allegation, Plaintiffs claim that Jones was present at the city government's "command center" with Thomas and several others on August 12 and heard Thomas give the stand-down order to police to "let them fight it will be easier to declare an unlawful assembly." *Id.* at ¶ 62. Jones did not rebuke him in any way for giving the order. *Id.* at ¶ 63.

Defendant Becky Crannis-Curl, a Lieutenant Virginia State Police ("VSP") Trooper who supervised all VSP troopers monitoring the UTR rally, *id.* at ¶ 43, is alleged to have similarly allowed Antifa members to impose a heckler's veto on Plaintiffs and their associated Alt-Right protestors. *Id.* at ¶ 64. Plaintiffs claim that she "advised fellow law enforcement that she was going 'off-plan' and refused to send [VSP] 'arrest teams' into the street," and she communicated this order to those VSP troopers under her command. *Id.* at ¶¶ 64–65 (citing Heaphy Report at 121). The Charlottesville police were also advised by other VSP troopers that state police would not engage the crowd "if safety was compromised" and other VSP troopers advised citizens and Charlottesville police that "they were 'under orders' not to intervene or 'not to break up fights.'" *Id.* at ¶ 66 (citing Heaphy Report at 122). Plaintiffs further allege that, after VSP troopers were asked why they were not taking action to restore order, one replied, "Our policy today is that we cannot get involved in every skirmish, and we are here to protect the public's safety." *Id.* at ¶ 70 (citing Heaphy Report at 132).

On the day of the event, Kessler, as the UTR rally organizer and permit-holder, attempted to enter the formerly named Lee Park. Plaintiffs allege that law enforcement instructed him that access to the park was limited to the Market Street entrance, which was crowded with Alt-Right

protestors and Antifa counter-protestors who were engaging in skirmishes. *Id.* at ¶¶ 72–73. After making his way through the crowd and into the park, Kessler ventured to the designated speaker's area, which was blockaded by VSP troopers. *Id.* at ¶ 75. Kessler attempted to gain access to the speaker's area, but VSP troopers allegedly informed him that he would not be permitted to enter the area to prepare for his rally until Charlottesville police allowed him to do so. *Id.* Plaintiffs allege, however, that no Charlottesville police were available nearby to advise as to when this might be. *Id.* Shortly after this point, law enforcement declared the event to be an unlawful assembly under Virginia law. *Id.* at ¶ 76. Consequently, all persons—including Plaintiffs, the Alt-Right protestors, and the Antifa counter-protestors—were ordered to leave the park. *Id.*

On the day of the event, before an unlawful assembly had been declared by law enforcement, Plaintiff David Matthew Parrott allegedly spoke with police about Antifa members' violent behavior and at one point, was surrounded by Antifa members. *Id.* at ¶ 77. Despite his requests, Plaintiffs allege that Charlottesville police were uncooperative in restraining the Antifa members. *Id.* After an unlawful assembly had been declared, Plaintiffs allege that Parrott did not leave the park, but instead "walked up to the Confederate statue on the hill to achieve a better vantage point for planning his group's exit." *Id.* While attempting to do so, he was arrested, detained, and then transported to jail. *Id.*

On August 12, 2019, Plaintiffs Jason Kessler and David Parrot filed this action, Dkt. 1, alleging claims pursuant to 42 U.S.C. § 1983. Between October 24 and October 25, all five Defendants filed motions to dismiss the claims against them. Dkts. 36, 38, 40, 42, 44. The matter is now fully briefed and ripe for review.

9

### III. ANALYSIS

The state undertakes a heckler's veto when it suppresses speech based on the threat, or possibility, of a hostile or violent response from the audience. *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 554 (4th Cir. 2010); *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. Stuart*, 934 F.2d 318 (Table), 1991 WL 93048, at *2 (4th Cir. 1991) (per curiam) (citing *Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985). Plaintiffs claim Defendants effectuated a heckler's veto and so violated Plaintiffs' First Amendment rights by their *inaction*, as well as by their *actions*.

Plaintiffs argue that by Defendants' inaction, they breached a legal duty to protect the Plaintiffs from the Antifa counter-protestors' heckler's veto of the UTR rally. Dkt. 47 at 1. They claim that Defendants had an "affirmative duty to take action to protect the Plaintiffs' free speech rights and were required to narrowly tailor any abridgment of those rights to the least restrictive means." *Id.* at 4. Defendants counter that the state is under no obligation to protect Plaintiffs' First Amendment rights from the acts of private parties, and thus Defendants were well within their rights to command officers to refrain from quelling the crowd in the lead-up to the declaration of an unlawful assembly.

Plaintiffs also argue that by taking action to declare an unlawful assembly, Defendants effectuated a heckler's veto in violation of the First Amendment, because their decision to make such a declaration was based on the allegedly expected and foreseeable hostile reaction to the content of Plaintiffs' message. Dkt. 1 at ¶ 17. On the other hand, Defendants argue that the dispersal of both Alt-Right protestors and Antifa counter-protestors alike was a content- and viewpoint-neutral restriction on speech intended to protect public safety.

First, the Court concludes that Charlottesville has no liability to Plaintiffs under *Monell*. *See infra* Subsection III.A. Charlottesville's stand-down order to police (Chief Thomas's

command to "let them fight it will be easier to declare an unlawful assembly," *id.* at ¶ 62) did not violate Plaintiffs' First Amendment rights, because it did not breach any affirmative constitutional duty to Plaintiffs, and furthermore, the decision to declare an unlawful assembly in accordance with the stand-down order was a content- and viewpoint-neutral application of the Virginia unlawful assembly statute. Second, the Court considers and rejects Plaintiffs' contention that the individual defendants are similarly liable for the claims against them. *See infra* Subsection III.B. At bottom, the Court concludes that Plaintiffs' claims fail to state a cause of action, however framed.

### A. Plaintiffs' Claim Against the City of Charlottesville

A municipality cannot be held liable solely because one of its employees has violated the constitutional rights of another. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *id.* at 663 n.7. But local governments can be sued under Section 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. As the Supreme Court summarized:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694 (emphasis added). Unlike claims against officials, which are subject to a qualified immunity defense, claims against municipalities "are measured against current law," and their obligations need not have been "clearly established" at the time of the alleged violations. *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014).

The Court holds that the alleged stand-down order to police and corresponding declaration

of an unlawful assembly did not violate Plaintiffs' constitutional rights. The City of Charlottesville, therefore, is not liable under *Monell*, and the Court will grant the motions to dismiss as to Count IV.

1. *Stand-down order to police did not violate any affirmative constitutional right*

Defendants contend that this Court's prior decision in the UTR case *Turner v. Thomas*, 313 F. Supp. 3d 704 (W.D. Va. 2018), *aff'd* 930 F.3d 640 (4th Cir. 2019), all but resolves this case too. In *Turner*, 313 F. Supp. 3d at 714, this Court held that the Fourteenth Amendment did not impose a legal duty on law enforcement to protect life, liberty, or property of the counter-protestor plaintiff in that case, based on the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services.*, 489 U.S. 189 (1989), and its progeny in the Fourth Circuit, *see, e.g.*, *Doe v. Rosa*, 795 F.3d 429 (4th Cir. 2015) (holding that the president of a public military college had no affirmative duty under the Due Process Clause to protect children from being molested at a summer camp held at the college); *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir. 1995) (holding that a police officer's failure to uphold a promise to incarcerate a man posing a danger to a woman and her children did not constitute affirmative misconduct by a state actor under the state-created danger doctrine). Indeed, in *Turner*, the Fourth Circuit has already affirmed the dismissal of a lawsuit brought by counter-protestors at the UTR rally against the police chief and superintendent, concluding there was no clearly established right that "it was not clearly established at the time of the rally that failing to intervene in violence among the protesters would violate any particular protester's due process rights." 930 F.3d at 640.

According to Defendants, if they had no affirmative constitutional obligation to protect Plaintiffs' life, liberty, or property—as these cases hold—neither could Defendants have had any affirmative constitutional obligation to protect Plaintiffs' First Amendment rights. Plaintiffs argue, unconvincingly, that the rule from *DeShaney* is inapposite, because the Court is faced with a case

arising under the First Amendment, not the Fourteenth.

In *DeShaney*, the Supreme Court held that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." 489 U.S. at 195. The Due Process Clause of the Fourteenth Amendment reads, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. As the Supreme Court noted, the Amendment is written in the negative: it prevents the state from "depriv[ing] individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Deshaney*, 489 U.S. at 195. In short, "its purpose was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196.

The text of the First Amendment reflects a similar structure: Congress shall make no law . . . abridging the freedom of speech or of the press; or of the right of the people peaceably to assemble . . . ." U.S. Const. amend. I.[4] As with the Fourteenth Amendment, the First Amendment merely guarantees that the state will not suppress one's speech. It does not guarantee that the state will protect individuals when private parties seek to suppress it. *See Musso v. Hourigan*, 836 F.2d 736, 743 (2d Cir. 1988) ("We do not believe, however, that the defendant's alleged failure to prevent [another] from violating [the plaintiff's] first amendment rights transgressed any clearly established legal norm. As a general rule, a government official is not liable for failing to prevent another from violating a person's constitutional rights, unless the official is charged with an affirmative duty to act."); *Doyle v. Town of Scarborough*, No. 2:15-cv-00227, 2016 WL 4764902

---

[4] The rights embodied in the First Amendment, of course, have been incorporated against the states through the Fourteenth Amendment, and thus restrict not just federal action, but that of the states as well. *Gitlow v. New York*, 268 U.S. 652 (1925).

13

(D. Maine Sept. 13, 2016); *Morlock v. West Cent. Educ. Dist.*, 46 F. Supp. 2d 892, 922 (D. Minn. 1999) (finding the First Amendment does not impose upon the government an affirmative duty to adopt and act upon every speaker's position, citing *DeShaney*). And, as the Fourth Circuit held in *Doe v. Rosa*, "there simply is no constitutional right to be protected by the state against . . . criminals or madmen." 795 F.3d at 440 (quoting *Fox v. Custis*, 712 F.3d 84, 88 (4th Cir. 1983)) (internal quotation marks omitted).

The Court finds applicable to this case the Supreme Court's reasoning in *DeShaney* and its progeny in this Circuit, which hold there is no constitutional due process right to state protection of life, liberty or property from the actions of private actors. As both the First Amendment and the Fourteenth Amendment embody negative—as opposed to positive—rights, it stands to reason that a comparable claim to affirmative state protection for one's speech must fail as well.

The precedent Plaintiffs cite do not support their claims. Plaintiffs' counsel contended at oral argument that *Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985), was their strongest case binding on this Court (though they devoted scarcely two lines to it in their brief). They claim it demonstrates that "state actors have a duty to 'stringently safeguard' protected speech." Dkt. 47 at 3 (citing *Berger*, 779 F.2d at 1001). The Court finds that regardless of the true breadth of that claim, it in no way extends to imposing an affirmative obligation to protect a speaker from being heckled by private persons.

In *Berger*, the defendant police department had conditioned the plaintiff's ability to maintain his policing powers on his agreement to stop performing in blackface during his off-duty time in clubs and taverns, which he did regularly, after the police department received complaints from the black community about the plaintiff's performances. After refusing to cease his performances and on the basis of these complaints, the department stripped the plaintiff of his

policing powers and placed him in an administrative role. The Fourth Circuit held that the police department had effectuated a heckler's veto because it had based its decision to strip the plaintiff of his policing power on the hostile reaction of the community to his performances. *Id.* at 1002. But *Berger* in no way suggests that the state had an obligation to prevent hecklers from drowning out the plaintiff's First Amendment activities in the first place. Rather, it merely stands for the proposition that the state cannot restrict an individual's ability to engage in expressive conduct because of a potentially threatening response to that conduct from the community. *Id.*; *see Scruggs v. Keen*, 900 F. Supp. 821, 830 (W.D. Va. 1995). Moreover, the court was careful to note that the performances had, by the defendants' own admission, not resulted in a "significant impairment" in the department's community relations or disrupted the "internal harmony or operations" of the department. *Id.* at 996. Thus, *Berger* is readily distinguishable, considering the allegations in this case reflecting the open and actual violence that took place in Charlottesville on August 12, 2017—the backdrop against which Defendants' challenged conduct took place.

Both parties cite extensively to the Sixth Circuit's opinion in *Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015) (en banc). Defendants take from *Bible Believers* the proposition that law enforcement need not "go down with the speaker" and may "attempt to disperse the entire crowd if [such action] becomes necessary." Dkt. 48 at 5 (citing *Bible Believers*, 805 F.3d at 253). Plaintiffs cite this case for the proposition that "state officials are not entitled to rely on community hostility as an excuse not to protect, by inaction or affirmative conduct, the exercise of fundamental rights." Dkt. 47 at 3 (quoting *Bible Believers*, 805 F.3d at 236–37). But Plaintiffs misstate the case. Under the guise of citing to the Sixth Circuit's reasoning in that case, Plaintiffs have instead cited to a parenthetical citation, summarizing a different case entirely, found within a letter from the plaintiffs to the defendants in *Bible Believers*—the Sixth Circuit had merely

included the text of that letter as part of the factual background in its opinion.

In *Bible Believers*, an evangelical Christian group and its members sued a county, its sheriffs, and deputies alleging that they had taken action to effectuate a heckler's veto against them at the 2012 Arab International Festival in Dearborn, Michigan. The group displayed messages that were offensive to the predominantly Muslim crowd and carried a severed pig's head on a spike, *id.* at 238, but otherwise promoted their offensive messages in a peaceful manner and did not engage in any violence with members of the crowd. *Id.* at 239. The crowd, however, became hostile and began jeering, throwing bottles and other flying debris, and shouting profanities. *Id.* This behavior temporarily subsided after a police officer arrived on the scene and asked some of the crowd participants to move out of the way. The officer suggested to the evangelical group that they always "have the option to leave" and declined the evangelical group's request that the officer remain in the general vicinity. *Id.* at 239–40. After the crowd resumed its bottle-throwing, a group of officers returned and informed the evangelical group that they would be escorted out of the festival. *Id.* at 240.

As grounds for the evangelical group's removal, the officers explained that their conduct was "especially . . . causing this disturbance and it is a direct threat to the safety of everyone here" and that "part of the reason they throw this stuff . . . is that you tell them stuff that enrages them." *Id.* The officers later informed the group that if they did not leave the festival, they would be cited for disorderly conduct. *Id.* The Sixth Circuit highlighted that "virtually absent from the video in the record is any indication that the police attempted to quell the violence being directed toward the Bible Believers by the lawless crowd," *id.* at 241, and was careful to note that "throughout the harassment and violence directed at them, the Bible Believers remained calm and peaceful," *id.* at 253.

16

The Sixth Circuit held that "when a peaceful speaker, whose message is constitutionally protected, is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or snuffing out the lawless behavior of the rioting individuals." *Id.* at 252. But the Sixth Circuit did not articulate an absolute rule in that regard. Rather, the court further recognized that consideration must be afforded for the safety of law enforcement: "[T]he Constitution does not require that the officer go down with the speaker. If, in protecting the speaker or attempting to quash the lawless behavior, the officer must retreat due to risk of injury, then retreat would be warranted." *Id.* at 253 (internal quotation marks omitted). Ultimately, the Sixth Circuit announced its rule that "when the police seek to enforce law and order, they must do so in a way that does not unnecessarily infringe upon the constitutional rights of law-abiding citizens." *Id.* (citing *Gregory v. City of Chicago*, 394 U.S. 111, 120 (1969) (Black, J., concurring))

There is a large gap between the circumstances the Sixth Circuit faced in *Bible Believers* and that which this Court has before it. Indeed, as the Sixth Circuit remarked, "[t]he Constitution does not require that the officer go down with the speaker." *Bible Believers*, 805 F.3d at 253. But that is exactly what Plaintiffs' position demands of law enforcement here. Plaintiffs' own allegations reflect a level of violence during the UTR rally that was leagues beyond the bottle-throwing in *Bible Believers*. Even Plaintiffs' complaint acknowledges that "a lot of people were hurt and beaten on both sides," a far cry from the peaceful—even if highly offensive—protests of the Bible Believers. Dkt. 1 at ¶ 58. According to the Heaphy Report, "Unite the Right demonstrators pushed forward with their shields and hit the counter-protestors with flagpoles. Open source video footage shows demonstrators violently jabbing the poles at counter-protestors' faces. Eventually, the demonstrators pushed the counter-protestors away with brute force and a cloud of pepper spray." Dkt. 43-1, Ex. 1 at 7 (Heaphy Report at 130). The Heaphy Report indicates

that, not long before the unlawful assembly was declared, "demonstrators and counter-protestors were fighting inside the park, and they engaged in more violent confrontations—throwing debris, attacking each other with sticks, and recklessly spraying pepper spray . . . ." *Id.* at 10 (Heaphy Report at 134).

Plaintiffs' allegations even state that "officers were not to be sent out among the crowd where they might get hurt," *id.* at ¶ 50, and that VSP troopers advised Charlottesville police that "they would not send VSP troopers to engage the crowd 'if safety was compromised,'" *id.* at ¶ 66, which speaks directly to the Sixth Circuit's caveat that "the officer need not go down with the speaker." *Bible Believers*, 805 F.3d at 253. Indeed, unlike in *Bible Believers* and other heckler's veto cases, *see, e.g., Ku Klux Klan Invisible Empire, Inc.*, 1991 WL 93048, at *3 (finding imminent threat of violence sufficient to remove Ku Klux Klan from parade); *Berger*, 779 F.2d 992, there was not just a threat of violence or some other hostile reaction, the violence alleged was actual and extreme. *See* Dkt. 1 at ¶ 58. Plaintiffs do not allege that such violence was the result of any affirmative act on behalf of Defendants; rather, according to their own allegations, it was the product of tension between the protestors and the counter-protestors.[5]

While Defendants did, of course, have a constitutional obligation to refrain from restricting Plaintiffs' speech on account of the threat, or possibility, of public hostility to their Alt-Right message, the law is clear that Defendants had no constitutional obligation to *prevent* that public hostility. Considering the Supreme Court's decision in *DeShaney* and related precedent holding there is no constitutional due process right to state protection of life, liberty or property from the actions of private actors, it would stand to reason that a comparable claim to state protection of one's speech must fail as well. At the very least, officers have no obligation "to go down with the

---

[5] Plaintiffs merely allege that Defendants only knew and desired that such violence would occur. Dkt. 1 at ¶¶ 16–17. This falls short of affirmatively acting to cause such violence.

speaker" before taking steps to shut down a public forum entirely, as Plaintiffs' position would demand they do. Thus, Plaintiffs' allegations that the City of Charlottesville directed officers to refrain from intervening to stop the violence that prevented Plaintiffs from engaging in expressive activity do not state a plausible claim premised on infringement of their First Amendment rights.

### 2. *Declaration of unlawful assembly as effectuation of heckler's veto*

Plaintiffs further argue that the decision to declare an unlawful assembly was based on Antifa's allegedly predictable hostile reaction to Plaintiffs' "Alt-Right" views—a content-based application of the statute, Va. Code § 18.2-406. Content- or viewpoint-based restrictions on expressive activity receive strict scrutiny, meaning that the Government's regulation must be narrowly tailored to achieve a compelling governmental interest. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011). But restrictions that are content- or viewpoint-neutral, yet still incidentally restrict speech, receive intermediate scrutiny. *Turner Broadcasting Sys., Inc. v. Fed. Commc'ns. Cmm'n*, 512 U.S. 622, 642 (1994). Under intermediate scrutiny, the Court must examine whether the restriction furthers an important or substantial governmental interest that is unrelated to the suppression of free expression and no more extensive than necessary in order to serve that governmental interest. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804–05 (1984) (citing *United States v. O'Brien*, 391 U.S. 367 (1968)).

Thus, the Court will first determine whether Defendants' decision to declare an unlawful assembly amounted to effectuating a heckler's veto—that is, whether it was declared because of the threat, or possibility, of a hostile reaction from the public—and then it will apply the appropriate level of scrutiny. As the allegations in the complaint reflect that the decision to declare an unlawful assembly was made without reference to the content of Plaintiffs' Alt-Right message or the mere threat or possibility of a public hostile reaction to that message, the Court will review

19

this application of the unlawful assembly statute under intermediate scrutiny.[6]

While Plaintiffs make a bare allegation that Defendants permitted this violence in order to declare an unlawful assembly because of the public hostility to the content of Plaintiffs' speech, Dkt. 1 at ¶ 79, this allegation is devoid of any factual content and is akin to a mere legal conclusion. *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). Moreover, Plaintiffs' own factual allegations conflict with that allegation and paint a different narrative: Defendants' concern was the actual and open violence created by conflict between protestors and counter-protestors, which risked compromising officer safety had they intervened before the declaration of an unlawful assembly. *Cf. Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 553 (finding a heckler's veto was effectuated where individuals working at a state university denied plaintiff access to university facilities based on only a *prediction or concern* that plaintiff's planned event would lead to a hostile or violent reaction from a crowd). As previously noted, Plaintiffs' allegations go so far as to indicate that "officers were not to be sent out among the crowd where they might get hurt," *id.* at ¶ 50, and that VSP troopers advised Charlottesville police that "they would not send VSP troopers to engage the crowd 'if safety was compromised,'" *id.* at ¶ 66.

Plaintiffs' own allegations demonstrate that the decision to command officers to refrain from breaking up fights before the declaration of an unlawful assembly was not for content- or viewpoint-based reasons. Rather it was a means of ensuring officer and public safety in a context where the violence between the two factions had escalated to such a degree that "people were hurt and beaten on both sides." Dkt. 1 at ¶ 58. Because there are no factual allegations to support their position, the Court is unable to conclude that Plaintiffs have stated a plausible claim that the

---

[6] Plaintiffs do not claim that Virginia's unlawful assembly statute, Va. Code § 18.2-406, is facially violative of the First Amendment, either because it purports to restrict protected speech or is facially content- or viewpoint-based.

declaration of an unlawful assembly was made for content- or viewpoint-based reasons. If anything, the only inference that can be drawn from Plaintiffs' allegations is that concerns for both officer and public safety carried through into the decision to declare an unlawful assembly when the violence of that day began to reach a fever pitch.

Thus, even assuming that Plaintiffs' speech was protected by the First Amendment,[7] it is difficult to find that the unlawful assembly was declared for anything but content- and viewpoint-neutral reasons. It is therefore deserving of only intermediate scrutiny—not strict scrutiny as Plaintiffs' contend. Under intermediate scrutiny, the Court must examine whether the restriction furthers an important or substantial governmental interest that is unrelated to the suppression of free expression and no more extensive than necessary in order to serve that governmental interest. *Taxpayers for Vincent*, 466 U.S. at 804–05 (1984) (citing *O'Brien*, 391 U.S. 367).

Plaintiffs contend that Defendants were under an obligation to more narrowly tailor the unlawful assembly declaration by picking non-violent participants from the pool of protestors and counter-protestors to remain on the site. The Court disagrees. Considering the allegations regarding the violent and tumultuous circumstances of the UTR rally, the Court concludes that Defendants' decision to declare an unlawful assembly—temporarily shutting down the forum—

---

[7] It is axiomatic that the First Amendment does not protect violence. *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 916–17 (1982). Advocacy that is "directed at inciting or producing an imminent and specific lawless action is likely to incite or produce such action" is not protected. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Where acts of violence follow strong language that has a tendency to incite violence, "a substantial question [is] presented whether [one] could be held liable for the consequences of that unlawful conduct." *Id.* at 928; *see Sines v. Kessler*, 324 F. Supp. 3d 765, 802–03 (W.D. Va. 2018).

On these motions to dismiss, however, the Court need not find that Plaintiffs' speech was unprotected by the First Amendment in order for the Court to conclude that their complaint fails to state a claim and must be dismissed. Rather, the dispositive questions before the Court are whether Defendants had a constitutional obligation to make efforts to keep the peace before having to declare an unlawful assembly, and whether the declaration of an unlawful assembly was motivated by the threat of a hostile reaction from the crowd to Plaintiffs' Alt-Right message.

was appropriately tailored to the substantial governmental interests of limiting the spread of the violence and protecting officer safety. *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001) (citing *Hill v. Colorado*, 530 U.S. 703, 715 (2000)).

Under intermediate scrutiny and given the chaotic and violent period preceding the declaration of the unlawful assembly as described in the complaint, law enforcement could not possibly have had an affirmative obligation under the Constitution to reliably identify non-violent individuals from the various ideological camps present to remain at the site. Instead, the declaration of an unlawful assembly left ample alternative channels of communication open for speakers to re-congregate at a later time or a different place. Thus, the Court finds it was no more extensive than necessary to meet the government's interests at stake here. *Taxpayers for Vincent*, 466 U.S. at 804–05 (quoting *O'Brien*, 391 U.S.at 377) (applying intermediate scrutiny by examining whether the regulation served a substantial governmental interest and was appropriately tailored, leaving ample alternative channels of communication open"); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (stating that content- and viewpoint-neutral restrictions on speech must be narrowly tailored such that they "leave open ample alternative channels for communication").

In sum, Plaintiffs' allegations that Defendants failed to prevent private parties from mutually engaging in violence that led to the declaration of an unlawful assembly did not state a claim for the violation of a constitutional right. Further, the allegations in the complaint reflect that the declaration of an unlawful assembly was done for content- and viewpoint-neutral reasons and survives intermediate scrutiny. Thus, the complaint does not state a claim for liability under Section 1983, and Plaintiffs' *Monell* claim under Count IV against the City of Charlottesville will be dismissed. As Charlottesville's alleged policy did not violate any constitutional right, the Court

need not address whether the alleged policy was appropriately issued or ratified by a final policymaker and thereby adopted by the City. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (requiring policies to be adopted or ratified by a "final policymaker" for liability to attach under *Monell*); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (holding that municipal liability is possible under *Monell* for even a single decision by a final policymaker in some circumstances, regardless of whether the action ordered is taken once or repeatedly).

### B.  Individual Defendants' Alleged Violations of Section 1983

As discussed in the analysis in the foregoing section, the Court concludes that Plaintiffs had no constitutional right to state protection from private parties who take actions to suppress their speech, nor did Plaintiffs suffer any violation of a constitutional right when the unlawful assembly was declared. Thus, Plaintiffs' heckler's veto claims under Counts I, II, and III against Defendants Thomas, Crannis-Curl, and Jones, respectively, fail to state a claim for relief under Section 1983. Furthermore, even if such a constitutional right did exist, there can be little doubt that it would not be clearly established, and therefore these Defendants sued in their individual capacity would be entitled to qualified immunity from Counts I, II, and III on these grounds as well. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see Rock for Life-UMBC*, 411 F. App'x at 555 (finding qualified immunity protected state-university employees who effectuated a heckler's veto under an expectation that violence would break out at plaintiff's planned event).

Plaintiffs' supervisory liability claims against Defendants Thomas and Crannis-Curl under Counts V and VI fail for the same reason. To state a supervisory liability claim under Section 1983, Plaintiff must satisfy three elements:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit

authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (collecting cases); *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014). As to the second prong, "a plaintiff '[o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct.'" *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)) (alterations in original).

Under *Shaw*, Plaintiffs must make a double showing: (1) whether supervisory liability under Section 1983 was clearly established at the time of the incident; and (2) whether the alleged underlying constitutional violation was also clearly established. *Turner*, 313 F. Supp. 3d at 715. Here, while supervisory liability in the Section 1983 context is clearly established, *id.* at 801, the constitutional violation undergirding Plaintiffs' allegation of supervisory liability is not. As demonstrated in Subsection III.A.1, there was no constitutional right to state protection from a private party's heckler's veto, nor the consequences that flowed from the unprevented violence between the protestors and the counter-protestors—that is, the declaration of an unlawful assembly. To the contrary, as in Fourteenth Amendment jurisprudence, there is simply no constitutional right to state protection of one's First Amendment rights from third parties, and a state official's failure to provide such protection "is not actionable under § 1983." *See Doe*, 795 F.3d at 440. Accordingly, given the Court's conclusion there was no underlying right, it stands to reason that no such right was "clearly established," and thus the Court will grant the motions to dismiss with respect to Counts V and VI.

## CONCLUSION

As this Court holds that Plaintiffs did not suffer any violation of an existing constitutional right, their claims under Section 1983 must fail, and Defendants' motions to dismiss, Dkts. 36, 38, 40, 42, 44, will be granted.

The Clerk of the Court is directed to send a copy of this Memorandum Opinion to all parties of record.

Entered this _____ 21st _____ day of February, 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE