```
 1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF VIRGINIA
 2                    Charlottesville Division

 3   JASON KESSLER, et al.,            Civil No. 3:19cv00044

 4              Plaintiffs,

 5        vs.                          Lynchburg, Virginia

 6   CITY OF CHARLOTTESVILLE, et al.,
                                       10:07 a.m.
 7              Defendants.            January 16, 2020

 8

 9                TRANSCRIPT OF MOTIONS HEARING
              BEFORE THE HONORABLE NORMAN K. MOON
10             UNITED STATES SENIOR DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiffs:      JAMES EDWARD KOLENICH
                              Kolenich Law Office
13                            9435 Waterstone Blvd.  Suite 140
                              Cincinnati, OH  45249

14                            ELMER WOODARD
                              5661 US Hwy 29
15                            Blairs, VA  24527

16   For Deft. City          RICHARD H. MILNOR
     Of Charlottesville and  Taylor Zunka Milnor & Carter LTD
17   Tarron J. Richardson:   414 Park St.
                             Charlottesville, VA  22902
18
     For Deft. Al S. Thomas:  MELISSA Y. YORK
19                            DAVID P. CORRIGAN
                              Harman Claytor Corrigan & Wellman
20                            P.O. Box 70280
                              Richmond, VA  23255
21
     For Deft. Crannis-Curl:  ERIN R. MCNEILL
22                            Office of the Attorney General
                              202 North Ninth St.
23                            Richmond, VA  23219

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer.
```

```
 1    APPEARANCES (Cont'd):

 2    For Deft. Jones:          ROSALIE PEMBERTON FESSIER
                                Timberlake Smith
 3                              P.O. Box 108
                                Staunton, VA  24401
 4
      Court Reporter:           Sonia Ferris, RPR, OCR
 5                              U.S. Court Reporter
                                116 N. Main St.  Room 314
 6                              Harrisonburg, VA 22802
                                540.434.3181.  Ext. 7
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              THE COURT:  Good morning.

2              Call the case, please.

3              THE CLERK:  Yes, Your Honor.

4              This is Civil Action 3:19cv44, Jason Kessler, and

5     others, v. The City of Charlottesville, and others.

6              THE COURT:  Plaintiff ready?

7              MR. KOLENICH:  Ready, Your Honor.

8              THE COURT:  Defendants ready?

9              MS. YORK:  Yes, Your Honor.

10             THE COURT:  All right.  We're here on defendants'

11    motions, so whoever would like to start.

12             MS. YORK:  Good morning, Your Honor.  Missy York from

13    Harman Claytor on behalf of former chief of police, Al

14    Thomas.

15             An August 12, 2017, Jason Kessler, David Parrott, and

16    members of the Alt-Right converged on Charlottesville for the

17    Unite the Right rally.  Counter-protestors, including members

18    of Antifa groups, also descended upon the city.  Mutual

19    combat and violence ensued, resulting in a declaration of an

20    unlawful assembly and dispersal of all in attendance.

21    Kessler and Parrott have now sued former chief of police, Al

22    Thomas; former city manager, Maurice Jones; current city

23    manager, Tarron Richardson; Virginia State Police, Lt. Becky

24    Crannis-Curl; and the city itself, alleging violations of

25    their First Amendment rights of free speech and expression.

1          Specifically, plaintiffs allege that defendants

2    permitted the heckler's veto by standing down and refusing to

3    protect the Alt-Right so that the rally could proceed as

4    planned.  Plaintiffs have not stated a claim against Chief

5    Thomas, for four reasons.  First, there are no facts to

6    support the claim of an alleged heckler's veto.  Second,

7    Chief Thomas did not have a duty to protect the plaintiffs.

8    Third, there are no facts to support a claim of supervisory

9    liability.  And finally, Chief Thomas is entitled to

10   qualified immunity.

11          Turning first to the heckler's veto.  A heckler's

12   veto occurs when an enforcement action is taken against a

13   peaceful speaker based on a listener's reaction to that

14   speech.  That is not what occurred on August 12, 2017, and is

15   not what plaintiffs allege in their complaint.  There was

16   mutual combat and violence among protestors and

17   counter-protestors leading to the declaration of an unlawful

18   assembly and dispersal of the entire crowd.  By its very

19   nature, that was a content and viewpoint-neutral restriction

20   of speech.  Furthermore, it was an action wholly within the

21   defendants' rights to take.

22          The Supreme Court of the United States in Cantwell v.

23   Connecticut stated:  "When clear and present danger, a riot,

24   disorder, interference with traffic upon the public streets,

25   or other immediate threat to public safety, peace or order

1   appears, the power of a state to prevent or punish is

2   obvious."

3          Here, the Virginia unlawful assembly statute provides

4   that an assembly is unlawful, "whenever three or more persons

5   assembled share the common intent to advance some lawful or

6   unlawful purpose by the commission of an act or acts of

7   unlawful force or violence likely to jeopardize, seriously,

8   public safety" --

9          THE COURT:  Are sufficient facts in the complaint to

10  support that both sides were engaged in --

11         MS. YORK:  -- in violence, Your Honor?

12         THE COURT:  -- disorderly or violent conduct?

13         MS. YORK:  Yes, there are, Your Honor.

14         While the complaint does attempt to portray the

15  Alt-Right as innocent victims of the Antifa conduct, if you

16  look at the Heaphy report, which is mentioned in the

17  complaint and can be considered at the motion to dismiss

18  stage, it is clear that there was mutual combat and violence

19  among all those in attendance.

20         THE COURT:  The Heaphy report is not a part of the

21  complaint.

22         MS. YORK:  If the Heaphy report is not a part of the

23  complaint, Your Honor, yes, we believe that there are

24  sufficient allegations in the complaint itself to demonstrate

25  that there was mutual violence.

1          THE COURT:  Let me ask you before we go on.  Would

2    you contest incorporating the Heaphy report into the

3    complaint as an integral part of the document?

4          MS. YORK:  Do we contest incorporating the Heaphy

5    report?  No, Your Honor.

6          THE COURT:  I'll ask all the parties the same

7    question.

8          MR. KOLENICH:  Jim Kolenich for the plaintiff, Your

9    Honor.  We do not contest incorporating the Heaphy report as

10   an integral part of the complaint.

11         MS. MCNEILL:  Erin McNeill on behalf

12   of Lt. Crannis-Curl.  We do not contest.

13         MS. FESSIER:  Rosalie Fessier on behalf of Maurice

14   Jones.  We do not contest.

15         MR. MILNOR:  On behalf of the City and Tarron

16   Richardson, we don't contest the part of the allegations in

17   the complaint -- not the truth, but it is part of the

18   complaint.

19         MR. CORRIGAN:  Your Honor, I'm David Corrigan.  I

20   also represent Chief Thomas with Ms. York.

21         MS. YORK:  Your Honor, so we do believe the

22   allegations in the complaint, even absent the Heaphy report,

23   support the fact there was mutual combat and mutual violence

24   such that the unlawful assembly could be declared.  The

25   declaration of unlawful assembly has not been challenged.  So

```
1    it is a fact that was declared.  And the United States

2    District Court for the Eastern District of Virginia in United

3    Steel Workers v. Dalton ruled that the unlawful assembly

4    statute does not impermissibly infringe on First Amendment

5    rights.  That holding is consistent with the Supreme Court's

6    decision in Cantwell that the police can regulate speech when

7    there's a threat to public safety.

8            So, Your Honor, August 12, 2017, was not a heckler's

9    veto but a content and viewpoint-neutral police decision to

10   protect the public safety.  The facts of this case stand in

11   stark contrast with that of Bible Believers v. Wayne County,

12   Michigan in which the Sixth Circuit Court of Appeals

13   determined that the county violated the Bible Believers First

14   Amendment rights by effectuating a heckler's veto.  In that

15   case, there was an evangelical group that attended an Arab

16   festival to try to convert non-believers and call sinners to

17   repent.  They walked through the festival wearing T-shirts

18   bearing their message and carrying signs and even carried a

19   severed pig's head on a stick.  They preached to the festival

20   attendees, and onlookers began to throw bottles and debris.

21   Each time a police officer would approach the crowd, the

22   actions would cease.  But then, eventually, the Bible

23   Believers were removed from the festival in lieu of being

24   arrested for disorderly conduct, and the police informed them

25   that they were "attracting a crowd and affecting public
```

1   safety."  The district court granted the defendant's motion

2   for summary judgment, and a panel of the Sixth Circuit

3   affirmed, but en banc, the Sixth Circuit reversed because

4   there were less restrictive means available to maintain

5   public order in lieu of removing the Bible Believers from the

6   festival.

7        But unlike the situation in <u>Bible Believers</u> where you

8   had a peaceful demonstration that was then bombarded by

9   assaults of onlookers, plaintiffs were not part of a peaceful

10  protestor group that was dispersed because of the actions of

11  onlookers and listeners.  Faced with the unlawful assembly

12  involving both protestors and counter-protestors, law

13  enforcement dispersed the entire crowd, and that was a

14  content and viewpoint mutual restriction of speech, did not

15  constitute a heckler's veto and, therefore, did not violate

16  the plaintiff's First Amendment claim.

17       Moreover, in support of their First Amendment claim,

18  plaintiffs rely heavily on the allegation that law

19  enforcement did not take sufficient action to quell the

20  counter-protestors, instead purposefully doing nothing so

21  that they could declare unlawful assembly.  But plaintiffs

22  still have a constitutional right to protection.  It is

23  well-established under the Supreme Court, the Fourth Circuit

24  and even this Court's precedent that there's no

25  constitutional right to police protection from unlawful acts

1   by private citizens.  In fact, this Court in <u>Turner v. Thomas</u>

2   held that there was no clearly established right to police

3   protection when a counter-protestor was injured during the

4   August 12, 2017, Unite the Right rally.  Similar to

5   plaintiffs in this case, Mr. Turner argued that there was a

6   stand-down order and police took no action to protect him

7   from violent protestors.  This Court concluded, and the

8   Fourth Circuit affirmed, that Chief Thomas was entitled to

9   qualified immunity because there was no constitutional duty

10   to protect.  Nevertheless, plaintiffs here argue that law

11   enforcement had an affirmative duty to protect their right to

12   free speech.

13       In <u>Deshaney v. Winnebago County Department of Social</u>

14   <u>Services</u>, the Supreme Court concluded the Fourteenth

15   Amendment language of "no state shall deprive any person of

16   life, liberty or property without due process of law" was a

17   limitation on the state's power to act, not a guarantee of

18   certain minimal levels of safety and security.  The court

19   determined that the Fourteenth Amendment did not confer an

20   affirmative right to governmental aid, even where necessary

21   to secure life, liberty or property.

22       Similar to the language of the Fourteenth Amendment,

23   the First Amendment provides, in relevant part, that

24   "Congress shall make no law abridging the freedom of speech

25   or the press or the right of the people to peacefully

1    assemble."  This, likewise, limits government's power to act

2    and does not confer an affirmative right to governmental aid.

3         If there's no constitutional right to protection of

4    one's life from violence under the Fourteenth Amendment,

5    there's certainly no constitutional right to protection of

6    free speech under the First Amendment.  For these reasons,

7    the plaintiffs have not stated a claim for violation of the

8    First Amendment.

9         Nor have they stated a claim against Chief Thomas for

10   supervisory liability.  Plaintiffs seem to hold Chief Thomas

11   liable because he was supervising city police officers and

12   allegedly caused them to fail in their duty not to acquiesce

13   to the heckler's veto.  Shaw v. Stroud established a

14   three-part test for establishing supervisory liability under

15   Section 1983.  The supervisor must have actual or

16   constructive knowledge that his subordinate engaged in

17   conduct that posed a "pervasive and unreasonable risk of

18   constitutional injury."  The supervisor's response to that

19   knowledge must be so inadequate as to show deliberate

20   indifference or tacit authorization, and there must be an

21   affirmative causal link between the supervisor's inaction and

22   the particular constitutional injury.

23         Here, plaintiffs' claim for supervisory liability

24   fails for the same reason that the First Amendment claim

25   fails; namely, that they did not have a constitutional right

1    to be protected and there was no constitutional injury.

2          Moreover, even if plaintiffs have stated a claim,

3    Chief Thomas is entitled to qualified immunity.  This Court

4    previously determined in Turner v. Thomas that Chief Thomas

5    was entitled to qualified immunity for the acts of August 12,

6    2017, a decision that was affirmed by the Fourth Circuit and

7    for which cert was denied by the Supreme Court of the United

8    States.  The Court should reach the same decision in this

9    case.

10         As Your Honor is aware, there are two prongs to

11   qualified immunity:  First; that the facts allege a violation

12   of a constitutional right; and second, that the right was

13   clearly established at the time of the violation.  As argued

14   on brief and here today, the facts in the complaint do not

15   allege a violation of plaintiffs' constitutional rights.

16   Furthermore, such a right was not clearly established on

17   August 12, 2017.

18         To determine if a right is clearly established, the

19   law must be particularized to the facts of the case.  A Court

20   must ask whether it would have been clear to a reasonable

21   officer that the alleged conduct was unlawful in the

22   situation he confronted.  This Court has already determined

23   that it was not clearly established that ordering officers

24   not to intervene in private violence between protestors was

25   an affirmative act within the state created danger doctrine.

```
1    That decision was affirmed on appeal.  If anything, it was

2    clearly established at the time of the Unite the Right rally

3    that failing to intervene in private violence does not

4    violate any constitutional rights.  For example, in Johnson

5    v. City of Seattle, the Ninth Circuit concluded that a

6    passive operational plan in which law enforcement did not

7    engage with violent actors did not amount to a constitutional

8    violation.

9         Similarly, it was not clearly established here that

10   Chief Thomas would violate plaintiffs' First Amendment rights

11   by declaring an unlawful assembly in the wake of violence and

12   fighting amongst protestors and counter-protestors and

13   dispersing the entire crowd.  Because plaintiffs have not --

14        THE COURT:  How much violence did it take before he

15   was entitled to shut it down?

16        MS. YORK:  Your Honor, the law enforcement must make

17   the decision that the unlawful assembly statute was violated.

18   So there has to be acts of unlawful force or violence likely

19   to jeopardize, seriously, public safety, and that decision

20   was made and it has not been challenged, and it's admitted in

21   the complaint that an unlawful assembly was declared and the

22   entirety of the crowd was dispersed.

23        THE COURT:  The chief had determined that violence

24   would occur.

25        MS. YORK:  It was occurring and that's why the
```

1    unlawful assembly was declared.

2         THE COURT:  When the people got together, was he

3    required to take any less restrictive type of action that

4    might have prevented this --

5         MS. YORK:  There's no preemptive action --

6         THE COURT:  -- that would have prevented him from

7    having to declare an unlawful assembly?

8         MS. YORK:  No, Your Honor.  Because there is no duty

9    to protect under the First Amendment, just like there's no

10   duty to protect under the Fourteenth Amendment, there was no

11   action that was required to be taken, short of declaring the

12   unlawful assembly, because all of the crowd was dispersed.

13   It was necessarily a content and viewpoint neutral

14   restriction on speech.  Everyone was dispersed, not just the

15   Alt-Right, and not just the counter-protestors.

16        THE COURT:  Well, if he knew there was going to be

17   disorderly conduct there or enough violence to declare the

18   unlawful assembly -- he waits to do that.  He knows he's

19   going to shut down.  His plan is to shut the whole thing down

20   and will deny the plaintiffs their -- they have the permit to

21   make their speech.  Is he helping the hecklers?

22        MS. YORK:  No, Your Honor.  Because there's no

23   affirmative duty of the state to take the action the

24   plaintiffs neglect to have taken to protect their right to

25   speech, just like there was no -- this Court has determined

1    there was no duty to protect under the Fourteenth Amendment

2    in that situation, to intervene and take action, law

3    enforcement did not have a duty to intervene and take action

4    in order to permit the speech to continue.  They have a duty

5    not to suppress speech, but once the violence ensued, the

6    unlawful assembly statute was triggered and everyone was

7    dispersed.  So there was no heckler's veto.  It's not like

8    Bible Believers where you had a passive group that was --

9        THE COURT:  I know he shut down both.  There's no

10   question about that.  But since he was anticipating declaring

11   an unlawful assembly -- he pretty much knew it was going to

12   come to that point -- was he required to take any action that

13   would have been less of a deterrent to the First Amendment

14   rights of a party?

15       MS. YORK:  Your Honor, it's our position that he did

16   not have to take less restrictive action.  There's no case

17   law to suggest that there's an affirmative duty to protect

18   the rights of free speech.  There's no affirmative duty to

19   protect one's life under the Fourteenth Amendment.  So there

20   was no duty there, Your Honor.

21       I would accede to my co-counsel.

22       THE COURT:  All right.

23       MS. MCNEILL:  Erin McNeill, Your Honor, representing

24   Lt. Crannis-Curl of the Virginia State Police.

25       Lt. Crannis-Curl is in a very similar position with

1   respect to the law as Chief Thomas so I won't go over the

2   points that Ms. York just made for this Court.  I would like

3   to say, however, in response to the Court's last question,

4   that the police did take intermediate steps before the

5   governor declared the unlawful assembly.  They were visibly

6   present everywhere throughout the planned area where this

7   rally would occur, and through routes to Emancipation Park.

8   They had barriers set up for the speakers and police manning

9   those barriers in an attempt to divide the hostile crowd from

10   the inflammatory speakers, and those two intermediate steps

11   were specifically cited by the Sixth Circuit in Bible

12   Believers as being appropriate intermediate steps that law

13   enforcement should take before they attempt to interrupt the

14   speech or restrict the speech, and both of those actions were

15   taken.

16          In Bible Believers, the Sixth Circuit expressly said

17   that because the police, when they were present, did quell

18   the hostile reaction of the crowd, restricting the speech

19   wasn't an appropriate step because simply a greater police

20   presence would have interrupted, slowed or stopped the

21   violence.  And in this case, the police did have an extremely

22   visible presence throughout that area in an attempt to

23   dissuade the crowd from reacting with unlawful violence, and

24   that is an appropriate intermediate step.  Barriers were

25   another intermediate step that was cited by the Sixth Circuit

1  as being appropriate before interrupting the speech, and

2  those were present and manned at the time.

3       Finally, in Bible Believers, the Sixth Circuit

4  expressly said that the police don't have to go down with the

5  speaker, although they can't turn a complete blind eye, even

6  in the Sixth Circuit, to the possibility of hostility like

7  those police did at the Arab festival.  They simply walked

8  away and let the peaceful speakers be victimized by the

9  inflamed crowd.  Here, the police were standing by, but they

10  don't have to put their own health and safety in jeopardy to

11  intervene in stopping a violent reaction to a speaker.

12  That's even in that Bible Believers case from the Sixth

13  Circuit, which goes beyond anything we have here in the

14  Fourth.

15       I would also say that this actually isn't a heckler's

16  veto case.  Mr. Kessler made a heckler's veto case when he

17  challenged the revocation of the permit for the rally.  He

18  argued that to restrict his permit, because there was

19  violence anticipated -- that's a heckler's veto, and that

20  fact pattern fits a heckler's veto argument a little better.

21  But, here, we're talking about what actually happened at the

22  rally, and the complaint does not seem to dispute that once

23  the rally becomes a riot, the state certainly can disrupt a

24  riot or disperse all people equally, and that's not a

25  heckler's veto.  It appears Kessler is trying to make an

```
 1   argument that he had a greater right to police protection to
 2   prevent the inflamed reaction of the crowd or, specifically,
 3   Antifa.  But that puts us more squarely under the fact
 4   pattern of Turner v Thomas than Bible Believers.
 5        In Turner v. Thomas, as this Court knows -- it was
 6   decided in this court.  That's where you have protestors who
 7   want to speak.  They're put in jeopardy by
 8   counter-protestors.  As Ms. York already very ably argued,
 9   that was a case where Mr. Thomas was relying on his right to
10   life and personal security and that the state had a duty to
11   protect that constitutional right to life.  But this Court
12   found, correctly, and was affirmed on that point, and cert
13   was denied by the Supreme Court, that there is no right to
14   police protection, not even to protect your life or personal
15   safety.  Here, Mr. Kessler attempts to recast that same
16   argument, but instead of a right to life, it's a liberty
17   interest in his right to free speech.  But there's no greater
18   right to police protection to protect your free speech than
19   there is to protect your life, certainly, and these facts
20   don't even approach the case law that we have.  In that line
21   of cases that were predecessors to Turner v. Thomas where you
22   have really egregious facts where the police absolutely knew
23   something happened -- they had a person in custody and
24   released the person to commit violence -- the Antifa was
25   never in police custody, and in fact, the complaint goes
```

```
1    through pages and pages of allegations of how Antifa follows
2    the Alt-Right around the country and has disrupted multiple
3    rallies and speeches around the country, clearly showing that
4    the Antifa reaction was not set in motion by any of the
5    defendants.  And, furthermore, the complaint itself actually
6    takes the step of discussing what happened at another
7    Alt-Right rally before Mr. Kessler's where the police
8    provided a more active protection so that those KKK members
9    could get in and out of their parking deck without being
10   harmed, and the complaint even admits that those police
11   officers were assaulted by the crowd, that they weren't
12   effective in completely preventing the violence, and that
13   that informed the reaction in Mr. Kessler's -- at Mr.
14   Kessler's rally.  That's in the complaint itself, without
15   incorporating any documents, that the police had that prior
16   reaction from Antifa and weren't able to stop them from
17   attacking the KKK at an earlier rally.  Therefore, you have
18   right in the complaint that the Antifa reaction was not
19   something set in motion by the state, nor was it something
20   that could have effectively been prevented by the state.  And
21   the case law is very clear even in the Sixth Circuit where
22   they've articulated this heckler's veto in greater detail
23   than we have here in the Fourth that the police don't have to
24   put themselves in jeopardy to save a speaker, and the
25   complaint is unusually detailed in admitting those facts.
```

```
1              Your Honor, I just did want to add before I conclude

2    that the complaint itself does reference mutual combat,

3    although obliquely.  Although it does say with respect to Lt.

4    Crannis-Curl that she was concerned about sending her

5    officers out into the jeopardy, that they were observing

6    mutual combat.  At least from the perspective of the

7    defendants, they believed that both sides were engaged in

8    mutual combat, and that's in the complaint itself, without

9    incorporating the report that the perception was that there

10   was mutual combat and that the combatants were from both

11   sides, as alleged in the complaint.

12             Other than that, I would stand on what Ms. York

13   articulated for Chief Thomas.  The case law applies very

14   similarly to Lt. Crannis-Curl because there's no right to

15   police protection to prevent Antifa's violent reaction beyond

16   the preventative measures they took that proved ineffective.

17   There could be no supervisory liability for officers who

18   didn't violate Mr. Kessler's rights, and certainly no state

19   actor is liable for the wrongful acts of third parties.

20             The qualified immunity analysis from Turner v. Thomas

21   is exactly the same as it is in this case.  None of the state

22   actors in this case had notice that they had this duty to

23   protect Mr. Kessler's right to free speech without a violent

24   reaction from Antifa.  It would be an impossible duty and,

25   fortunately, here in the Fourth, the law is quite clear that
```

```
1    it doesn't exist, and that has been affirmed by the Fourth,

2    and cert was denied by the Supreme Court.  I think that's as

3    clear a statement on the law as we can get.

4          So for that reason, I respectfully conclude.  Thank

5    you, Your Honor.

6          THE COURT:  Thank you.

7          MS. FESSIER:  Good morning.  I'm Rosalie Fessier here

8    on behalf of Maurice Jones.

9          Maurice Jones was the former city manager, and he

10   stands in very similar position as Chief Thomas.  The

11   allegations against Mr. Jones are even more remote and

12   removed than they are against Chief Thomas.  The allegation

13   against Mr. Jones is not that he took any overt act, but

14   rather that he stood by as the city manager while Chief

15   Thomas declared the unlawful assembly and dispersed the

16   entire crowd based upon the mutual combat and violence that

17   broke out in August of 2017.  So for that reason, we do adopt

18   the arguments put forth by Ms. York on behalf of Chief

19   Thomas.  I would just highlight a few additional points

20   briefly, Your Honor.

21         In paragraphs 50, 51 and 52 of the complaint, that is

22   where the allegations are contained addressing the mutual

23   combat and mutual violence that broke out that was perceived

24   by Chief Thomas and by Mr. Jones, which led to the unlawful

25   assembly declaration.  The Court asked that question
```

1    previously.  I know that all counsel have agreed for the

2    Court to consider as part of this motion to dismiss the

3    Heaphy report, but there are allegations -- specific

4    allegations in the complaint that do set forth the existence

5    of the mutual combat.

6         Because of that mutual combat, as argued before, it

7    renders the actions content-neutral and, therefore, the

8    strict scrutiny analysis that plaintiff argues just simply

9    does not apply.  As has been pointed out, Mr. Thomas has been

10   given qualified immunity in the Turner case under the

11   Fourteenth Amendment and, likewise, should be given qualified

12   immunity here under the First Amendment.  There's no law on

13   the books that we have been able to locate which identifies a

14   duty to protect, as has been argued.  If Chief Thomas gets

15   qualified immunity here, then so does Mr. Jones, who is only

16   alleged to have stood by and not fired Chief Thomas as he

17   enacted the unlawful assembly.  For those reasons, we ask the

18   Court to grant our motion to dismiss.

19        Thank you.

20        THE COURT:  Thank you.

21        MR. MILNOR:  Your Honor, Richard Milnor on behalf of

22   the City of Charlottesville and its current city manager,

23   Tarron Richardson, who was sued in his official capacity

24   only.

25        First, as to Tarron Richardson, our motion to dismiss

1    was based on the law set forth in our brief that,

2    essentially, the official capacity claim against him is

3    duplicative of the attempted Monell claim against the city.

4    If there is a Monell claim, the case law indicates and states

5    that Tarron Richardson should be dismissed.  Plaintiff, in

6    their response, agrees with that so we would ask that he be

7    dismissed.

8         For the reasons previously set forth by counsel for

9    the individual capacity defendants, we submit that since

10   there is no claim stated of a heckler's veto, no claim stated

11   of a First Amendment constitutional violation by them,

12   therefore, since there is no undergirding constitutional

13   violation by either Thomas or Jones as a final policymaker,

14   based on the allegations in the complaint, the city is

15   entitled to dismissal of the Monell claim, similarly to what

16   was done in Turner v. Thomas, which, as indicated -- stated

17   before -- was affirmed by the Fourth Circuit, and then

18   petition for certiorari was denied on January 13th by the

19   U.S. Supreme Court.

20        Briefly, as to the mutual combat allegations, I did

21   have a note.  As Ms. Fessier noted in paragraphs 50, 51 and

22   52, it refers to the mutual combat and that the chief

23   allegedly witnessed that and made his decision.  We submit

24   and agree that there is no -- the First Amendment doesn't

25   protect violence, and once there is violence, there's no

```
 1    First Amendment right.  Nor has plaintiff cited a case

 2    showing that he's entitled to police protection in advance --

 3    unilaterally, to police protection.  Furthermore, a heckler's

 4    veto, they state at -- in their brief -- that their claim --

 5    First Amendment claim basically lives or dies under the

 6    viability of a heckler's veto claim.  Well, as set forth by

 7    other counsel, in reality, in those heckler's veto cases,

 8    it's always the policy or the action has been applied

 9    unilaterally against one side.  Here, there's no dispute that

10    it was equally applied.  There's also no dispute based on the

11    claim that the police were confronted with two factions, and

12    there weren't just two or three people.  There were many,

13    many people.  What they did was reasonable intermediate

14    steps.  As said, there's simply no constitutional right to

15    unilateral state police protection, one side or the other.

16    He equally administered it, and we submit there's no

17    undergirding constitutional violation so the claim against

18    the city should be dismissed.

19            THE COURT:  With regard to the Monell claim, would

20    the facts be sufficient -- the alleged facts be sufficient to

21    show that the city manager ratified the policies enunciated

22    by the chief of police when he allegedly said, We're not

23    going to intervene; we'll just let them fight it out and then

24    I'll declare unlawful assembly?

25            MR. MILNOR:  Based on the allegations in the
```

```
1    complaint, I believe it alleges the former city manager was

2    present and heard that, and in earlier cases, we've argued

3    under the city charter the city manager is the final

4    policymaker, and we would argue that he's not -- well, first

5    of all, by being sued in their individual capacity, there's

6    no respondeat superior --

7         THE COURT:  I'm talking about the Monell claim.

8         MR. MILNOR:  On Monell and on the idea one or both

9    are final policymakers, the allegations are what they are --

10   that Jones basically witnessed it and didn't fire him, I

11   think is the allegation.

12        THE COURT:  Well, he could have overruled him; right?

13   He could have stepped in and said, No, I'm not going --

14   that's not going to be the reaction, because a city manager

15   can direct the police, I believe.

16        MR. MILNOR:  So under the charter, the charter does

17   indicate that the final authority rests with him.  So based

18   on the allegations that he's there and witnesses it and hears

19   it, as they've alleged, while we wouldn't agree as to that,

20   for purposes of the 12(b)(6), it does appear to be alleged.

21   But as a -- you've also got the idea that at the time this is

22   supposed to have happened when he witnessed what he

23   witnessed, the violence was, at that point, clearly ongoing.

24   Mutual combat violence.  So at that point, there is no First

25   Amendment protection to start with.
```

1            THE COURT:  The then city manager, when the chief of

2    police made the statement, We're not going to intervene until

3    they start fighting and then I can declare an unlawful

4    assembly -- the city manager is allegedly present.

5            MR. MILNOR:  During the time when the chief makes

6    that statement, the violence has already occurred.

7            THE COURT:  All right.

8            What are the specific allegations in there that -- is

9    that in the Heaphy report?

10           MR. MILNOR:  I don't think it's in their brief, and

11   they've said that they want, I guess, the Heaphy report --

12           THE COURT:  I thought the allegation was the chief

13   said, We're going to let them start fighting.

14           I didn't understand it, I guess.

15           MR. MILNOR:  Well, in paragraph 51 of the complaint,

16   it's alleged that -- well, paragraph 50, it says that the

17   instruction was not -- it didn't say for the police to do

18   nothing.  It said not to go in and break up every fight, not

19   to interrupt mutual combat.  It wasn't an instruction not to

20   do anything.  It was mutual combat, i.e., violence by both

21   sides.  Then it says in paragraph 51, which is what the chief

22   allegedly witnessed, that during the event, upon being

23   advised that the violence had broken out, the chief made his

24   statement, Let them fight, which Maurice Jones allegedly,

25   according to the complaint, was in the center and heard, and

1    they say he didn't fire the chief on the spot with that.

2           THE COURT:  All right.  Go ahead, then.

3           MR. MILNOR:  So we submit that by that time, there is

4    no -- clearly, there's no First Amendment right because the

5    First Amendment doesn't protect violence.  The chief has

6    advised it.

7           Now, I think the Court earlier on asked how much

8    violence does he have to witness?  Well -- but they had -- I

9    mean, he was obviously between a rock and a hard place with

10   mutual violence breaking out between both sides.  So the

11   action that he chose to do was not a heckler's veto.  It was

12   not unilaterally applied against just one side.  It was

13   applied against both sides and it was permissible under the

14   Virginia statute, and it's really not challenged by the

15   plaintiff -- the validity of the unlawful assembly

16   declaration.  But what they appear to be claiming is that

17   before the rally even began that the police had a duty to

18   protect them, the Alt-Right, as opposed to any duty to the

19   so-called counter-protestors.  They've cited no case showing

20   that they're entitled to a private municipal security force,

21   especially in this situation.

22           What happened is they did have police presence.  It

23   wasn't -- I remember back in the Turner v. Thomas case, the

24   Court asked the question:  Well, what if the police hadn't

25   even shown up?  I mean, then how could there be a Fourteenth

```
 1   Amendment violation?  Well, the police did do something.
 2   They did.  They did a lot.  And they showed up.  They
 3   monitored the situation.  There were barriers.  They
 4   attempted, and after the event, Monday morning, we have, you
 5   know, revisited and looked at what happened and say how could
 6   we do it better and what could we have done?  But they did.
 7   They -- and they're not required to go down with the speaker.
 8          We submit it was not unilaterally applied.  It was
 9   applied equally, and it's simply not a heckler's veto.
10          THE COURT:  Okay.
11          But your position is that the stand-down order was
12   given after the violence started, not before, that the
13   allegations are that the stand-down order was given before
14   any violence started.
15          MR. MILNOR:  They do allege that they planned to do
16   that, but it was in anticipation of this violence.  What
17   happened, they say, is, in paragraphs 50 and 51 and 52, that
18   upon that occurring, what happened was they declared an
19   equally applicable unlawful assembly, which for a brief
20   period of time curtailed First Amendment rights because
21   there's violence, ongoing violence.  And we submit that that
22   is not a heckler's veto and that there's no undergirding
23   constitutional violation against Chief Thomas or Chief Jones,
24   and so, therefore, there can't be a Monell claim against the
25   city.
```

```
 1              THE COURT:  Okay.  All right.

 2              Before you get started, is it the plaintiffs'

 3     position that the heckler's veto was effectuated by the

 4     acquiescence of the police when the stand-down order was

 5     given or when they acted or when they declared an unlawful

 6     assembly?

 7              MR. KOLENICH:  It's actually both, Your Honor.

 8              The plan to stand down and permit counter-protestor

 9     suppression of the plaintiff's speech constitutes a heckler's

10     veto.  However, there was a second incident, which is the

11     declaration of the unlawful assembly and kicking everybody

12     out.  It's the plaintiff's position -- and we're satisfied.

13     The presentations of counsel and the questions the Court has

14     asked, I don't intend to say very much up here anyway.  We're

15     happy with the state of the record and with our pleadings.

16              When they kicked everybody out, they perpetrated a

17     heckler's veto.  They were required, contrary to everything

18     that the defendants have presented here today -- the

19     heckler's veto law is well established in the Fourth Circuit,

20     even though everybody seems to be talking about Bible

21     Believers because that's the current leading case.  That is a

22     Sixth Circuit case.  But the Fourth Circuit has sufficiently

23     similar rules dating back to 1985 at least.  When they went

24     from police doing nothing to terminating the entire event,

25     that's a heckler's veto.  There were no intermediate steps
```

```
 1   taken.  The police never advanced and shut down the hecklers,
 2   or tried to.  The police had barriers, but those barriers
 3   excluded the speakers.  After they declared the unlawful
 4   assembly and Mr. Kessler presented himself and said, I'm the
 5   permit holder and I should be allowed to get in here and
 6   speak, even if everybody else is getting kicked out, they
 7   said, No, you're gone, too.  No speakers were ever allowed
 8   behind those barriers.  So this entire presentation is more
 9   or less the opposite of what happened that day except for the
10   mutual combat.  Yes, everybody knows that Unite the Right --
11   there was mutual combat.  No, we are not challenging the
12   unlawful assembly statute.  Of course the government has the
13   right to impose public order in the face of such a riot.
14   What we're alleging is the preexisting stand-down order
15   violated the heckler's veto of the First Amendment rights of
16   the plaintiff.  And, secondarily, after they made the
17   unlawful assembly decision, they should not have removed
18   everybody.  They should have left a couple of speakers, a
19   couple of supporters, a couple of counter-protestors, and a
20   couple of their supporters.  These were easily identified.
21   Kessler presented himself to the police and they had clergy
22   members there, who were no doubt known in the police
23   community to be not violent at all.  If they want to come in
24   and say Kessler was violent too, I guess that would be
25   different, but that's not part of the record at this point.
```

1          THE COURT:  Weren't there various groups on both

2     sides?  I mean, I guess we're talking about the statues.

3     There were more than one group there in favor of removal of

4     the statues, and more than one group in favor of not removing

5     the statues.

6          MR. KOLENICH:  Yes, Your Honor.

7          THE COURT:  How could the police be fair?

8          MR. KOLENICH:  They couldn't.  Once they've declared

9     the unlawful assembly and they're kicking the vast majority

10    of the people out, all we're saying is, at a bald minimum,

11    they should have left Kessler and a couple of other people

12    who the police didn't see do anything wrong.  If Kessler

13    says, Can I have these four guys stay with me to hear my

14    speech, and the policeman comes up and says, No, no, no, I

15    saw that guy throw a rock and he has to go -- but they didn't

16    do anything.  We don't need to get into trying to

17    second-guess government conduct.  They did nothing.  They

18    stood there with an existing stand-down order and waited

19    until they were told to clear the place out, and then they

20    cleared the place out.  And all of that because of the

21    content of the plaintiff's speech.  Now, when the melee

22    starts -- our fault, their fault, nobody's fault -- yes, the

23    police have a compelling interest to terminate that melee and

24    to clear the streets and get everything settled down,

25    although, as we all know, that's not what happened.  They

```
 1   cleared the streets and more violence occurred.  But we very

 2   much disagree that Dushaney is the proper standard on a

 3   heckler's veto, and we disagree they have any case that says

 4   that.  There are no cases that say that.  This is a First

 5   Amendment case.  It's a heckler's veto case, and I would like

 6   to -- I believe I have a citation here that's not in our

 7   brief that I would like to mention.  This is Rockford Life,

 8   411 Fed. Appx. 541 at 554, and it states that courts have

 9   recognized a heckler's veto is an impermissible form of

10   content-based speech regulation for over 60 years.  That's at

11   554.  And it cites to Berger v. Battaglia, 779 F.2d 992,

12   which is a Fourth Circuit reported case from 1985.

13        Yes, it's true there are no Fourth Circuit cases that

14   go into the detail of Bible Believers, but we believe the law

15   is still there.  Bible Believers states that the police have

16   a responsibility to enforce -- not Bible Believers -- Berger

17   v. Battaglia at 1001 states that the police are responsible

18   for enforcing First Amendment rights.

19        THE COURT:  What would be your best case that would

20   deny qualified immunity to the various individual defendants?

21        MR. KOLENICH:  I can't answer that with a single

22   case.  It's Bible Believers combined with Berger v.

23   Battaglia.

24        THE COURT:  Bible Believers is Sixth Circuit, and

25   that wouldn't count.
```

```
1           MR. KOLENICH:  Well, it's persuasive.

2           In the Fourth Circuit, it's Berger v. Battaglia,

3    combined with other cases, principally Rockford, like I just

4    mentioned.

5           As defense counsel stated, the Fourth Circuit does

6    not have a case similar to Bible Believers with that level of

7    discussion of heckler's veto.  But the Fourth Circuit

8    cases -- there is no dissent from the view that the heckler's

9    veto is well established in this circuit.

10          THE COURT:  Well, it's well established, but under

11   the particular facts close to those in this case --

12          MR. KOLENICH:  The facts close to those in this case

13   are, in fact, a little different from the average heckler's

14   veto case.  But in -- it's not true.  We very much disagree

15   that if there's a melee, heckler's veto goes out the window

16   and the riot statute takes over.  There couldn't be a

17   heckler's veto claim at all if that was true because the

18   counter-protestors would just show up, throw a few rocks, hit

19   on some people and that's it; there's a riot and they shut

20   the thing down, and there could never be a heckler's veto

21   claim then.

22          THE COURT:  I assume the Heaphy report would show

23   that it was anticipated that there would be violent groups on

24   both sides.

25          MR. KOLENICH:  I believe it does, yes, sir.
```

```
 1          THE COURT:  Do the police have an obligation, the
 2   City of Charlottesville have an obligation to furnish
 3   security for the event?
 4          MR. KOLENICH:  I think that's a debatable point, but
 5   we don't have to address it here because they were there.
 6   They were there in force.  Had they not shown up at all and
 7   people were calling 911 -- Hey, there's a riot going on --
 8   when the police show up and start arresting people and start
 9   clearing the place out, they still would have had a duty at
10   that point to protect the free speech rights of the
11   plaintiff.  They still should have figured out what was going
12   on there.  Did somebody have a permit?  Is there supposed to
13   be a speech?  And impose order and let as much of that speech
14   happen as they possibly can.  Now, theoretically, things
15   could be so out of control they can't do that, but they
16   didn't even try here, and that's really the gravamen of our
17   complaint, although we do agree, as counsel just said, that
18   our complaint lives or dies with the heckler's veto.  If the
19   Court finds we had no such right, then our case is gone.  We
20   agree with that characterization.
21          Thank you, Your Honor.
22          THE COURT:  Do you wish to respond?
23          MS. YORK:  Your Honor, the issue seems to be with the
24   alleged passive policing plan, and such a plan was not only
25   recognized as constitutional previously in this court, Turner
```

1    v. Thomas, but in the Ninth Circuit in the Johnson v. City of

2    Seattle case.   The concern with engaging groups of this

3    nature is that you make the problem worse.   They have the

4    capacity to make the decision to not engage to a certain

5    extent in order to best police the public safety.

6         It's ironic that we're here today because in other

7    cases, specifically, Turner v. Thomas, the argument was that

8    the defendants, including Chief Thomas, did not do enough to

9    protect -- to stop the violence.   Yet now, the suggestion is

10   that he should have taken some step short of declaring the

11   unlawful assembly and dispersing the crowd when there's no

12   suggestion that something else would have been successful.

13   This is a classic case of Monday-morning quarterbacking.   The

14   plaintiffs would have us believe the police should have gone

15   in and discerned who was for whom and who had a right to be

16   there and the law is, once unlawful assembly is declared,

17   everyone can be dispersed.

18        In Cantwell, the Supreme Court of United States said

19   when clear and present danger of riot, disorder, or immediate

20   threat to public safety exists, the police can intervene, and

21   the unlawful assembly statute says when conduct likely to

22   jeopardize, seriously, public safety, peace or order,

23   unlawful assembly can be declared.   The allegations in the

24   complaint establish those conditions existed.   Paragraph 73

25   says Mr. Kessler walked toward Market Street and saw the

1    skirmishes between Alt-Right trying to enter the park and

2    Antifa trying to impose a heckler's veto.   The allegations of

3    the complaint itself, absent going to the Heaphy report, show

4    that there was mutual combat.

5          The complaint also alleges that violence was

6    anticipated.   The plaintiffs cannot point to a single case

7    that suggests the police have a duty to affirmatively protect

8    First Amendment rights preemptively or otherwise.   Your

9    Honor, it's our point that under the Fourteenth Amendment,

10   they don't have -- the police don't have a duty to protect

11   one's life from violence so how could they possibly have a

12   duty to protect the plaintiff's speech?

13         So, Your Honor, we would argue that not only is there

14   not a heckler's veto, there's no First Amendment violation,

15   but it was not clearly established at the time of the

16   August 12, 2017, rally that Chief Thomas would have violated

17   anyone's constitutional rights to free speech by declaring

18   the unlawful assembly and dispersing the entire crowd, so he

19   is entitled to qualified immunity.

20         MS. MCNEILL:   Very briefly, Your Honor.   I just

21   wanted to address the argument that Berger v. Battaglia,

22   which is the Fourth Circuit case -- the only Fourth Circuit

23   case the plaintiffs have set forward and the Fourth Circuit

24   case that they cited to you as their best Fourth Circuit case

25   to put the defendants on notice that they had this duty to

```
 1    protect the plaintiff from a heckler's veto.  In Berger v.
 2    Battaglia, that was an employment case.  A police officer was
 3    told he had to stop performing in black face or he would be
 4    fired because the police chief or -- were concerned that for
 5    an officer to perform in black face would tarnish the
 6    reputation of the police force and the community and raise
 7    concerns in the community about that police officer's ability
 8    to police in a racially neutral manner, and the Court
 9    analyzed a heckler's veto in the context of what restrictions
10    on speech can a state employer put in place on a state
11    employee, what conditions can they put in place, and the
12    Fourth Circuit examined and held that to restrict the private
13    speech of a state employee that had no touch or concern with
14    their employment, simply because they were concerned about
15    the community reaction, was unlawful here in the Fourth
16    Circuit.  That fact pattern is so far afield from what the
17    defendants faced at the Unite the Right rally that it
18    provides no notice to them that they have a duty to protect
19    the free speech rights of a private citizen who is inflaming
20    the crowd.  The complaint itself admits that these parties,
21    both Antifa and the Alt-Right, have a longstanding history of
22    anonymity and violence.  So these two walked into -- these
23    two groups walked into the Unite the Right rally prepared for
24    violence, and to say that a case about an officer performing
25    in black face in his off hours and what restrictions an
```

1    employer can put -- a state employer can put on a state

2    employee as a condition of employment is so far afield from

3    what we're facing here that it does not defeat the qualified

4    immunity claims of Lt. Crannis-Curl or the other defendants,

5    for that matter.

6         Thank you, Your Honor.

7         THE COURT:  Okay.

8         MS. FESSIER:  I will note that in argument,

9    plaintiffs' counsel identified the -- or did acknowledge the

10   intermediate steps that police took.  That was police

11   presence.  That was the barriers; that while they challenge

12   the success of those efforts, that is not the standard by

13   which the Court judges the action there.  They did take

14   intermediate steps, the same types of things that were

15   identified in Bible Believers as alternative measures.  So

16   that was, in fact, done here.  The fact they may not have

17   been successful in retrospect does not change the analysis.

18   There were those intermediate steps and they were

19   acknowledged in the complaint and by the plaintiff.

20        Also, I will just point out that the stand-down order

21   was only with respect to mutual combat.  As is stated, and I

22   think Mr. Milnor pointed out in his argument in paragraph 50,

23   the stand-down order was that they were not to engage over

24   every little thing, not to go in and break up fights, not to

25   interrupt mutual combat.  So it was not an order to stand

 1    down when there was a peaceful victim being victimized.  So I

 2    think that is an important piece of the analysis as well.

 3         Thank you.

 4         THE COURT:  Thank you.

 5         Mr. Milnor?

 6         MR. MILNOR:  Just a brief word on the Berger case

 7    from the Fourth Circuit.  This is a 1985 case.  It was in the

 8    employment context.  It wasn't in the context of mass mutual

 9    combat by two sides who had a history acknowledged in the

10    complaint of combat at various events.

11         Also, the cite that they give to being stringently

12    safeguarded, from Berger, they leave out the part that that's

13    premised -- premised on peaceable means.  Peaceable.  They've

14    admitted that what happened -- what was feared might happen,

15    so you've got a mass of people and a limited number of

16    police, who do show up, and they did do something.  They

17    acted.  They had no duty under the Fourteenth Amendment to

18    prevent criminal acts by madmen.  We submit that if there's

19    no duty under the Fourteenth Amendment, the due process

20    clause, there can be no duty under the First Amendment to

21    provide a private security force for one side or the other.

22    What they did and is acknowledged in the complaint at

23    paragraph 70, where they talk about -- somebody talked to one

24    of the people -- one of the state troopers, and the trooper

25    replied, Our policy today is not to get involved in every

1    skirmish -- in other words, they were there.  And we're here

2    to protect the public safety.  That's what they were there

3    trying to do.  What happened was, as admitted, the mutual

4    violence came to such an extent that it was necessary to

5    declare an unlawful assembly, which they don't challenge, and

6    they can't challenge.  I mean, what happened happened.  So as

7    Monday-morning quarterbacking, we look now and say, well,

8    maybe, they could have done this, they could have done this,

9    they could have done this.  But what they had to do, what

10   they did do, was they were there to try and protect the

11   public safety, and what they didn't do is unilaterally impose

12   a heckler's veto, which is the heckler's veto cases, on one

13   side or the other.  It was equally applied to the violence

14   that was ongoing that played and played out.

15          So we submit there's no undergirding violation.

16   There's no Monell claim.

17          Thank you.

18          THE COURT:  All right.  I think you all have covered

19   everything well.  I'll let you know something reasonably

20   soon.

21          Good to see you.

22          (Proceedings concluded at 11:08 a.m.)

23   "I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

24

25   /s/Sonia Ferris                    January 21, 2021"